## PEOPLE v. McNULTY.*

### No. 20,659; December 12, 1891.

#### 28 Pac. 816.

**Ex Post Facto Law—Prisoners Awaiting Execution.**—Penal Code, section 1217, provides that the warrant for the execution of a prisoner sentenced to death must appoint a day for the execution, "which must not be less than thirty or more than sixty days from the time of judgment." Section 1227 imposes on the sheriff the duty of executing criminals. Section 1229 directs that the execution must take place in the county where judgment is rendered. Laws of 1891, page 272, amended these sections by providing that the day of execution "must not be less than sixty or more than ninety days from the time of judgment," and that the warrant must also direct the sheriff to deliver the prisoner to the warden of one of the state prisons, on which officer is imposed the duty of executing criminals, and directing that the execution take place in the prison to which the criminal is delivered. Held ex post facto as regards prisoners awaiting execution, because imposing greater punishments by the confinement in the state's prison than the acts repealed.[1]

**Ex Post Facto Law—Unconstitutionality in Part.**—Where it is evident that the legislature in passing such statute intended it to apply the new punishment alike in all cases of murder, past as well as future, and would not have passed it except as an entirety, and that its partial enforcement would produce effects which the legislature would never have sanctioned, the whole act must be declared unconstitutional.[2]

---

*For other opinions in this case, see 93 Cal. 427, 26 Pac. 597, 29 Pac. 61.

[1] Cited with approval in State v. Rooney, 12 N. D. 151, 95 N. W. 515, as following the definition of ex post facto laws given by Justice Washington in Calder v. Bull, 3 Dall. 390, 1 L. Ed. 648.

[2] Disapproved in State v. Rooney, 12 N. D. 158, 95 N. W. 518, where, a similar law being in discussion, the court takes the contrary view and expresses satisfaction at the California court having revised its own view upon a rehearing of the cited case: 93 Cal. 427, 29 Pac. 61.

Wilson & Troutt, Carroll Cook, J. E. Foulds and Wm. Hoff Cook for appellant; W. H. H. Hart, attorney general, for the people.

BEATTY, C. J.—The defendant was accused by information of the crime of murder, alleged to have been committed in March, 1888. In August, 1888, he was convicted of murder in the first degree, and, in accordance with the law as it then stood, was sentenced to be hanged by the sheriff in the county jail. On appeal to this court the judgment of the superior court was affirmed: 26 Pac. 597. But before a remittitur had issued our attention was called to certain amendments to the Penal Code, enacted by the last legislature, pending the appeal, changing the method and time for executing capital sentences, which, it is contended, are inapplicable to the case of this appellant, because they are, as to him, ex post facto, but which at the same time have the effect of repealing the old law, under which alone he could have been executed, the result being, as claimed, that in consequence of a blunder of the legislature he and all others in his situation must go free of all punishment. For the purpose of considering and determining this important question the judgment of affirmance was vacated and a reargument ordered. The case having been again argued and submitted, we are now to decide upon the effect of the legislation referred to.

The question involved is no less than this: Whether, since the date fixed for the taking effect of the amendatory statute—May 30, 1891—capital punishment can be inflicted in any case of murder, however atrocious, committed prior to that date; and whether, in a case like this, where a judgment of death, free from error, had been entered, but not executed, prior to said date, any punishment whatever can be inflicted. The gravity of this question will be better appreciated when it is understood that there are, according to the statement of the attorney general, no less than eighteen convicted murderers whose fate depends upon its solution, and who, if it is determined in favor of the contention of the appellant, must be turned loose upon society, unless this court shall, as his counsel suggests, reverse the judgments, with or without reason,

and remand the cases for new trials, in the hope that the juries before whom they may be again tried will, as in their discretion they might, impose the lighter penalty of imprisonment for life, in order to prevent the most deliberate murderers from going absolutely unpunished. We do not, however, feel at liberty to resort to such an evasion, or to convey such a suggestion to the superior court. We have already determined that the judgment in this case is free from error; that the appellant was duly and legally convicted and sentenced to die, according to the law of the land as it existed at the date of the judgment and at the date of the murder. Other cases must be decided according to the same rule and the same law. If in such cases we find, as we have found in this case, that the judgments are regular and valid, we must so declare; and if it is true, as contended, that the sentence in this case cannot be executed by reason of the repeal of the only law under which it could have been executed, and that the appellant must go free, so must all others in his situation. With a thorough appreciation, therefore, of the consequences to flow from our decision, we proceed to consider the case.

It is to be premised that from an early period in the history of California the crime of murder—the unlawful killing of a human being with malice aforethought—has been divided into two degrees—murder of the first and murder of the second degree. Without undertaking to state fully the distinction between the two crimes, it is sufficient for our purpose to say that the first degree includes those murders which are marked by deliberation or cruelty, or which are committed in the perpetration or attempt to perpetrate certain enumerated felonies of the gravest character. It has been the unvarying expression of the legislative will, sustained by the sentiment of the people of California, that such murders deserve the penalty of death by hanging, unless (according to a comparatively recent enactment) the jury trying the case, in their discretion, expressly determined by their verdict that the defendant may be punished by imprisonment in the state prison for life: Pen. Code, sec. 190; People v. Welch, 49 Cal. 174. In this law there has been no change since the commission of the homicide of which the appellant was convicted. It re-

mains, with the modification referred to, as it has remained for almost half a century, the settled policy of the state. There has never been manifested any intention on the part of the legislature or desire upon the part of the people that the death penalty in aggravated cases of murder should be abolished. On the contrary, the very latest expression of the legislative will is in favor of its continued infliction, with what counsel for appellant contends are added penalties and greater severity, resulting from the different manner prescribed for carrying it into execution. The recent amendments to the Penal Code, the effects of which we are to consider, do not present the first instance of changes made by the legislature in the manner of conducting the execution of capital sentences. Formerly, and for a long time, executions were public; but afterward the law was so amended as to require the execution to be conducted within the jail, and with comparative privacy. It has never been contended, so far as we are aware, that this amendment was void with respect to previous offenses on the ground of being ex post facto, although we think it would be shown by reasoning no less logical, and upon grounds no more fanciful, than are contained in the argument of counsel here, that execution within the walls of a jail before sunrise (Holden v. Minnesota, 137 U. S. 491, 34 L. Ed. 734, 11 Sup. Ct. Rep. 143), and in presence of the few persons designated by statute, or invited by the sheriff, would to many convicts be vastly more terrible than execution in public, in the light of day, in the presence of all who choose to attend, including friends, relatives and sympathizers. If this is so, or even if it may reasonably be supposed to be so, then, according to the argument, such an alteration of the law would be ex post facto, and void as to all previous offenses, though it was held otherwise in the case last referred to.

It must be admitted, however, that the supreme court of the United States found and declared a distinction, material in its view, between the statute of Minnesota—considered in the Holden case—and the statute of Colorado, under which the Medley case arose: Ex parte Medley, 134 U. S. 160, 33 L. Ed. 835, 10 Sup. Ct. Rep. 384. In that case Medley was convicted of murder, and sentenced to be hanged in the manner and at the time and place prescribed by a statute which did not go into effect, although passed, before he committed the murder. Pending the execution, and while in the custody of the warden

of the penitentiary, he sued out a writ of habeas corpus in the supreme court of the United States, where it was held that the statute referred to prescribed a different and severer punishment than that provided in the statute existing at the date of the murder; that it was, therefore, as to him, an ex post facto law, such as the states are by the federal constitution forbidden to pass (article 1, section 10), and incapable of enforcement. It was also at the same time held that since, according to the decision of the Colorado courts, the amendatory act had gone into effect, and thereby necessarily repealed the former law regulating the execution of capital sentences, there remained no law under which the petitioner could be punished, and he was accordingly discharged. Evidently, if our amendatory statute makes, as is contended, substantially the same changes in our law as were effected by the statute of Colorado, the same results must follow; that is to say, the sheriff cannot execute the judgment against the appellant, for the law authorizing him to act has been repealed; and, if the judgment is modified so as to conform to the new regulation, the supreme court of the United States will, as soon as the appellant is committed to the custody of the warden of the penitentiary, discharge him upon habeas corpus. In other words, we have here a federal question; a question of the validity of a state law, depending upon its conformity to the behests of the constitution of the United States; a question upon which the decisions of the supreme court of the United States are of binding and conclusive authority. It becomes necessary, therefore, to carefully examine and compare the two laws—that of Colorado and that of California— in order to determine whether this case falls within the principle of the Colorado case, and is governed by it.

The Colorado statute (Laws 1889, p. 118) is quoted at page 163, 134 U. S., page 837, 33 L. Ed., and pages 384 and 385, 10 Sup. Ct. Rep. According to the contention of the petitioner in that case, there were no less than twenty variances between the statute in force at the date of the murder and that under which he was sentenced, all of which he claimed to be changes to his prejudice and injury, and therefore ex post facto. The court, however, found it unnecessary to examine all these specifications, being satisfied that in two important particulars the law was infected with the vice imputed

to it. According to the old law, every person convicted of murder in the first degree was to suffer death by hanging, at such time as the court should direct, not less than fifteen nor more than twenty-five days after sentence, unless for good cause the governor should prolong the time. Pending the execution the prisoner was to be kept in the county jail, under the control of the sheriff of the county, who was the officer charged with the execution of the sentence. Solitary confinement was neither authorized by the former statute nor was its practice in use in regard to prisoners awaiting the punishment of death. By the new statute the judge passing sentence of death was required to issue a warrant directed to the warden of the penitentiary, appointing and designating therein a week of time within which such sentence must be executed, such week so appointed to be not less than two nor more than four weeks from date of sentence, commanding said warden to do execution of the sentence imposed upon some day within the week of time designated in the warrant. This warrant was to be delivered to the sheriff of the county, whose duty it was made to proceed to the penitentiary within twenty-four hours, and there deliver the prisoner and warrant to the warden, who thereupon was required to keep the convict in solitary confinement until the infliction of the death penalty; "and [the statute proceeded] no person shall be allowed access to said convict, except his attendants, counsel, physician, a spiritual adviser of his own selection, and members of his family, and then only in accordance with prison regulations." By section 3 of the act it was further provided that the warden should fix the particular day and hour of the week designated in the warrant for carrying out the sentence, and should invite to be present at the execution the sheriff of the county where the conviction was had, the chaplain and physician of the penitentiary, one practicing surgeon—resident of the state— the spiritual adviser of the convict, if any, and six reputable citizens of the state of full age. Besides these official witnesses no person was to be allowed at the execution, except the executioners necessary for the assistance of the sheriff; and all were forbidden, under heavy penalties, from divulging to any person, including the prisoner, the hour or day of his death. The court held that the provision for solitary confinement in the penitentiary between sentence and execution

and the provision requiring the prisoner to be kept ignorant and in suspense as to the exact time within a whole week when he might be called upon to die were substantial additions to the punishment previously prescribed, and rendered the act invalid as an ex post facto law. As to other points upon which the court failed to express an opinion we can only conjecture what their decision would have been if they had deemed it necessary to discuss them.

For the purpose of comparing the law of this state existing at the time the appellant committed the murder of which he was convicted with the amendments made or attempted by the act of 1891 (Laws 1891, p. 272), we shall quote sections 1217, 1227 and 1229 of the Penal Code, as they existed at the date of the crime, and in their amended form:

## THE OLD LAW.

"Sec. 1217. When judgment of death is rendered, a warrant, signed by the judge and attested by the clerk under the seal of the court, must be drawn and delivered by the sheriff. It must state the conviction and judgment, and appoint a day on which the judgment is to be executed, which must not be less than thirty nor more than sixty days from the time of judgment."

"Sec. 1227. If for any reason a judgment of death has not been executed, and it remains in force, the court in which the conviction was had, on the application of the district attorney, must order the defendant to be brought before it, or, if he is at large, a warrant for his apprehension may be issued. Upon the defendant being brought before the court, it must inquire into the facts, and, if no legal reasons exist against the execution of the judgment, must make an order that the sheriff execute the judgment at a specified time. The sheriff must execute the judgment accordingly."

"Sec. 1229. A judgment of death must be executed within the walls or yard of a jail, or some convenient private place in the county. The sheriff of the county must be present at the execution, and must invite the presence of a physician, the district attorney of the county, and at least twelve reputable citizens, to be selected by him; and he shall, at the request of the defendant, permit such ministers of the Gospel, not exceeding two, as the defendant may name, and any per-

sons, relatives, or friends, not to exceed five, to be present at the execution, together with such peace officers as he may think expedient, to witness the execution. But no other persons than those mentioned in this section can be present at the execution, nor can any person under age be allowed to witness the same.''

## THE ACT OF 1891.

"Sec. 1217. When judgment of death is rendered, a warrant, signed by the judge, and attested by the clerk, under the seal of the court, must be drawn and delivered to the sheriff. It must state the conviction and judgment, and appoint a day on which the judgment is to be executed, which must not be less than sixty nor more than ninety days from the time of judgment, and must direct the sheriff to deliver the defendant, within ten days from the time of judgment, to the warden of one of the state prisons of this state for execution; such prison to be designated in the warrant.''

"Sec. 1227. If for any reason a judgment of death has not been executed, and it remains in force, the court in which the conviction is had, on the application of the district attorney of the county in which the conviction is had, must order the defendant to be brought before it, or, if he is at large, a warrant for apprehension may be issued. Upon the defendant being brought before the court, it must inquire into the facts, and, if no legal reasons exist against the execution of the judgment, must make an order that the warden of the state prison to whom the sheriff is directed to deliver the defendant shall execute the judgment at a specified time. The warden must execute the judgment accordingly.''

"Sec. 1229. A judgment of death must be executed within the walls of one of the state prisons designated by the court by which judgment is rendered. The warden of the state prison where the execution is to take place must be present at the execution, and must invite the presence of a physician, the attorney general of the state, and at least twelve reputable citizens, to be selected by him; and he shall, at the request of the defendant, permit such ministers of the Gospel, not exceeding two, as the defendant may name, and any persons, relatives, or friends, not to exceed five, to be present at the execution, together with such peace officers as he may think expedient, to witness the execution. But no other persons

than those mentioned in this section can be present at the execution, nor can any person under age be allowed to witness the same.''

A comparison of these sections will demonstrate all the substantial changes—if there are any such—which the legislature has attempted to make in the old law. It will readily be seen that our statute differs materially from that of the state of Colorado. The day and hour of the execution are not to be kept secret from the prisoner under the new provisions any further than under the old; and the same persons, including those whom he is allowed to designate, are to be present at the execution. Neither is there any express provision for keeping him in solitary confinement during the time which is to elapse between the date of his delivery at the prison and the time of execution; and, if the opinion of the supreme court of the United States in Medley's case had rested solely upon their construction of the meaning of the term ''solitary confinement,'' we should have experienced no difficulty in distinguishing that case from the case before us. But in truth the context of the Colorado statute shows that the words ''solitary confinement'' were not used therein in their strict sense. The language of the act is as follows: ''Who shall keep such convict in solitary confinement until infliction of the death penalty; and no person shall be allowed access to said convict, except his attendants, counsel, physician, a spiritual adviser of his own selection, and members of his family, and then only in accordance with the prison regulations.'' It is scarcely necessary to say that a prisoner who may be visited in prison by his counsel, physician, spiritual adviser, and the members of his family, subject only to prison regulations (all prisons, including county jails, being governed by some reasonable regulations), is not kept in solitary confinement in the strict or usual sense of that term. And this consideration was no doubt pressed upon the attention of the court, for in their opinion, delivered by Mr. Justice Miller, they say: ''The qualifying phrase in this statute is but a small mitigation of this solitary confinement, for it expressly declares that no one shall be allowed access to the convict except certain persons, and these are not admissible unless their access to the prisoner is in accordance with prison regulations, prescribed by the board of commissioners of the penitentiary under section 2553 of

the General Statutes of Colorado, in force since 1877. This section declares that 'the board of commissioners of the penitentiary shall make such rules and regulations for the government, discipline and police of the penitentiary, and for the punishment of prisoners confined, not inconsistent with law, as they deem expedient.' What these may be at any particular time is unknown. How far they may permit access of counsel, physicians, the spiritual adviser, and the members of his family, is a question in their discretion, which they exercise by general rules, which may be altered at any time so as to exclude all these persons, and thus the prisoner be left to the worst form of solitary confinement. Even the statutory amelioration is a very limited one. By the words 'his attendants,' in the statute, is evidently meant the officers of the prison and subordinates, who must necessarily furnish him with his food and his clothing, and make inspection every day that he still exists. They may be forbidden by prison regulations, however, from holding any conversation with him. The attendance of the counsel can only be casual, and a very few interviews—one or two, perhaps, are all that he would have before his death; and that of the physician not at all, unless he was so sick as to require it; and the spiritual adviser of his own selection, and the members of his family, are all dependent for their opportunities of seeing the prisoner upon the regulations of the prison. The solitary confinement, then, which is meant by the statute, remains of the essential character of that mode of prison life as it originally was prescribed and carried out, to mark them as examples of the just punishment of the worst crimes of the human race.'' These extracts from the opinion of the court show that less importance was attached by the court to the punishment implied in the words ''solitary confinement'' than to the necessary or usual results of removing a prisoner from the county jail to the state prison, viz., that he can there be visited by counsel and members of his family less frequently, and only at greater inconvenience, and subject to prison regulations. If we are correct in this construction of the opinion, it follows that this case falls within the principle decided, for in this state, as in any other state, it must inevitably happen that in most instances the counsel and family of a prisoner will have less convenient access to him in the state prison than when confined in the county jail.

Besides this point of resemblance between the changes made in the Colorado law, and that attempted in our own, there is another. By the old law, in Colorado, the convict was to be executed not less than fifteen nor more than twenty-five days after sentence. By the amended law he was to be executed not less than fourteen nor more than twenty-eight days after sentence. In other words, his days of grace might be abridged one day, or his days of dread and apprehension might be prolonged for three days. No doubt these were among the twenty particulars in which the amendatory act was claimed to be in violation of the constitution of the United States; but the court did not express an opinion on this point, and we have no means of knowing how it would have been decided if the case had turned upon it.

By reference to section 1217 of the Penal Code above quoted, and the proposed amendment, it will be seen that the effect of the amendment, if valid, would be to change the period within which the execution must take place from not less than thirty nor more than sixty days to not less than sixty nor more than ninety days after judgment, the result of which is that under the amendment a convict might be kept alive and in dread and apprehension of a painful and ignominious death for thirty days longer than he could have been so kept under the old law. This change, also, it is strenuously argued, and apparently not without authority to sustain the contention, makes the law ex post facto. For, in the first place, it is said that, although by a vast majority of persons condemned to die on the scaffold any postponement of the date of execution would be eagerly welcomed as a boon, there may be some men to whom it would be an aggravation of their suffering. And, in the next place, it is contended that, even if this were not so, the principle that courts and legislatures may be allowed to change the punishment of crimes ex post facto in such manner as in their opinion renders the penalty lighter cannot be admitted without destroying the value of the constitutional guaranty, because there could be no certainty that the legislative or judicial discretion would always be wisely and mercifully exercised; and neither the legislator nor the judge is to be allowed to measure the feelings of the culprit by his own. In short, the cases have gone to the extent of holding that a law which changes the punishment of past

offenses in any manner whatever except by remitting a separable portion of the penalty previously prescribed, i. e., by reducing the amount of the fine, the number of stripes, the term of imprisonment, etc., is necessarily void as to all such offenses. It is unnecessary, however, to cite or to criticise the cases in which this matter has been considered by courts whose decisions do not bind us as authority, when we have a decision of the supreme court of the United States which is clearly in point.

We have seen that under the amendments of 1891 a person convicted of murder in the first degree and sentenced to death must within ten days thereafter be delivered to the warden of the state prison, and be confined by him for from fifty to eighty days in said prison. If it is in the power of the legislature to add to the penalty of death by hanging a previous imprisonment in the penitentiary for eighty days, the term might, under the same power, be extended to years. And even with respect to a short detention in the state prison this is what is said in the Medley case by the supreme court of the United States (134 U. S. 168, 169, 33 L. Ed. 839, 10 Sup. Ct. Rep. 386, 387): "Instead of confinement in the ordinary county prison of the place where he and his friends reside, where they may, under the control of the sheriff, see him and visit him, where the sheriff and his attendants must see him, where his religious adviser and his legal counsel may often visit him, without any hindrance of law on the subject, the convict is transferred to a place where imprisonment always implies disgrace, and which, as this court has judicially decided in Ex parte Wilson, 114 U. S. 417, 29 L. Ed. 89, 5 Sup. Ct. Rep. 935, Mackin v. United States, 117 U. S. 348, 29 L. Ed. 909, 6 Sup. Ct. Rep. 777, Parkinson v. United States, 121 U. S. 281, 30 L. Ed. 959, 7 Sup. Ct. Rep. 896, and United States v. De Walt, 128 U. S. 393, 32 L. Ed. 485, 9 Sup. Ct. Rep. 111, is itself an infamous punishment, and is there to be kept in 'solitary confinement,' the primary meaning of which phrase we have already explained."

Various other grounds are insisted upon by counsel as being each in itself sufficient to render the amendments of 1891 unconstitutional; as, that a convict confined in the state prison awaiting execution would, under the general law, as construed in the Arras Case, 78 Cal. 304, 20 Pac. 683, be compelled to

do hard labor during his confinement; and that he would, under the operation of sections 673, 674, of the Penal Code, become civilly dead, and be deprived of all civil rights, etc. We do not think there is anything in these points. There is nothing in the doctrine of the Arras case to sustain the conclusion that a prisoner confined in the penitentiary while awaiting execution could be compelled to labor, and sections 673, 674, could not be held applicable to such a case. But upon the other grounds above mentioned, and in conformity to the decision in the Medley case, to the authority of which we are compelled to yield obedience, we feel constrained to hold that neither this appellant nor any other person in his situation can be punished under the amendments of 1891, because as to him and all such persons such amendments are ex post facto and void.

This conclusion, however, does not dispose of the case, for the appellant was not sentenced to be executed in the manner prescribed by the amendments of 1891, but in the manner provided by the law in force at the date of the murder—that is to say, by the sheriff in the county jail; and the question is whether that sentence can be enforced. Clearly, it cannot be enforced if the old law authorizing the sheriff to execute capital sentences has been repealed. Such was the conclusion reached in the Medley case, and it is sustained by a long and unbroken line of decisions in the English and American courts as to the effect of the repeal of penal statutes. The exact question to be determined, therefore, is whether the old law has been repealed, and this depends upon the further question whether the amendments of 1891 are in force for any purpose, or to any extent; for, if they are not absolutely void as to all offenses, future as well as past, they took effect on the sixtieth day after the act was approved; and the moment they took effect the old law, at least in so far as it differed from the new, ceased to exist, for the mode of amending laws prescribed by our constitution was followed in this case by re-enacting the various sections of the Penal Code as amended, and under all the decisions of this court the moment such an amendment takes effect so much of the old law as is not re-enacted is repealed. There is, therefore, we repeat, no escape from the conclusion that, if the amendments of 1891 took effect on the 30th of May, 1891, for any purpose or to any extent, the old

law at the same time ceased to exist. Upon this point the contention of the appellant is that, as to all offenses subsequently committed, the act is valid and free from objection, and that as to them it must be held to be in force, with the consequence necessarily involved that the old law stands repealed. The attorney general, on the contrary, contends that since, by the terms of the amendments, they include past as well as future offenses, and since it is for many reasons apparent that the legislature intended to apply the same punishment to past as to future offenses, and since, in short, the amendatory act cannot have the effect which the legislature intended it to have, but only a partial effect, followed by a consequence so plainly at variance with the legislative will that it cannot be supposed that the law in its existing form would have been passed if such consequence had been foreseen, the attempted amendments should be declared absolutely and wholly void, and the old law in force. There can be no doubt that it was the intention of the legislature to apply the new method of execution in all cases of murder, past as well as future. The terms of the act sufficiently indicate this intention, and there is nothing outside of its terms to suggest anything different; for it cannot be supposed that a legislature which makes no change in the definition of murder or its degrees, which preserves the penalty of death by hanging for murder of the first degree, merely designating a different officer, time, and place for executing the sentence, could possibly have intended to grant a complete amnesty to all persons standing convicted of murder in the first degree and awaiting execution. Still less can it be supposed that there was an intention to set apart the period of sixty days between the passing and the taking effect of the law during which murders might be perpetrated by means of torture, poison, lying in wait, or any other cruel and deliberate means, or in the perpetration or attempt to perpetrate arson, rape, robbery or burglary, with absolute certainty that the perpetrator could not be punished in the manner, and the only manner, which the people of California and their representatives have ever deemed proper and adequate to such offenses. There is nothing fanciful about this statement. We know that it was a legal impossibility under the law as it stood between March and May, 1891, to complete the process against a murderer within sixty days if he availed himself of his legal rights,

and we know by reference to the cases of Medley and Savage, 134 U. S. 160–177, 33 L. Ed. 841, 842, 10 Sup. Ct. Rep. 384, 389, that in the state of Colorado two men at least, and we know not how many others, availed themselves of the opportunity presented by the interval between the passage and taking effect of the Colorado act to commit cruel and deliberate murders, which, as the law was subsequently construed, they must be presumed to have known could not be punished with death, nor punished at all, unless a jury, by paltering with their oaths, should find them guilty of a crime of lower grade than that which they had committed.

Proceeding, then, upon the assumption that it was the intention of the legislature to make the amendments of 1891 applicable to past as well as future offenses, and that they must have known that there were or might be past as well as future offenses to which they would apply, we come next to consider whether the law must be held valid as to one class of cases, though necessarily invalid as to the other. This is not a federal question, and, so far as it may have been involved in the conclusion reached in the Medley case, we are not controlled by that decision. It clearly appears, however, that the question was not there considered, the only question argued being the construction of the Colorado act, whether ex post facto or not: 134 U. S. 162–169, 33 L. Ed. 837–840, 10 Sup. Ct. Rep. 384–387. The supreme court of Colorado had already decided that the new act was in force, and necessarily that the old act was repealed, and upon this purely state question the supreme court of the United States merely adopted the conclusion of the state court. We are therefore free to consider it, uncontrolled by any superior authority. The general doctrine upon this subject is clearly and briefly stated at pages 213 and 214 of the sixth edition of Cooley's Constitutional Limitations as follows: "A legislative act may be entirely valid as to some classes of cases, and clearly void as to others. A general law for the punishment of offenses, which endeavors to reach, by its retroactive operation, acts before committed, as well as to prescribe a rule of conduct for the citizen in the future, would be void so far as it was retrospective; but such invalidity would not affect the operation of the law in regard to the cases which were within the legislative control. A law might be void as violating the obligation of ex-

isting contracts, but valid as to all contracts which should be entered into subsequent to its passage, and which, therefore, would have no legal force except such as the law itself would allow. In any such case the unconstitutional law must operate so far as it can, and it will not be held invalid on the objection of a party whose interests are not affected by it in a manner which the constitution forbids. If there are any exceptions to this rule, they must be of cases only where it is evident, from a contemplation of the statute and of the purpose to be accomplished by it, that it would not have been passed at all, except as an entirety, and that the general purpose of the legislature will be defeated if it should be held valid as to some cases and void as to others.'' It will be seen from the latter part of the above quotation that the learned author admits, or rather asserts by implication, that there may be cases in which a law which, as to part of its intended purpose, can have a constitutional operation, will nevertheless be held wholly void, when it is evident that it would not have been passed except as an entirety, and would, by being given a partial operation, defeat the general purpose of the legislature. It will also be observed that the proposition is stated in immediate connection with, and as an exception to, the doctrine as to the construction of statutes which, if allowed a retrospective operation, would impair the obligation of contracts, or would be ex post facto laws. The evident caution with which this rational exception to the general rule is announced by Judge Cooley is perhaps due to the fact that few, if any, adjudicated cases can be found in which it has been asserted or applied; but it is clear that he perceived the necessity that might arise for its application. And besides, the exception, as stated, is in substance precisely the same, and rests upon the same principle of statutory construction, as that applied in case of an act some sections or clauses of which are unconstitutional, while others are free from that objection. The rule in such cases is that if, when the unconstitutional clauses or sections are stricken out, that part of the act which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained: Cooley's Constitutional Limitations, 6th ed., p. 211. But if the different parts of the act are so mutually connected with

and dependent upon each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and, if all could not be carried into effect, the legislature would not pass the residue independently, then, if some parts are unconstitutional, all the provisions which are thus dependent, conditional, and connected must fall with them: Id., pp. 211, 212. These propositions are sustained by abundant authority cited in the notes under Judge Cooley's text. And there is no reason apparent why the admitted doctrine respecting statutes invalid as to connected conditional and dependent clauses and sections should not equally apply to a statute invalid as to connected, conditional and dependent purposes and objects. The controlling consideration in both cases must be the same, viz., that the courts will not enforce a statute which cannot operate as it was intended by the legislature to operate, when it is apparent that its partial enforcement will produce effects which the legislature would never have sanctioned. That this is a sound, wholesome, and even necessary principle of construction, we cannot doubt. And we are equally satisfied that it is, as intimated by Judge Cooley, applicable to a statute prescribing or altering the penalties for criminal offenses.

Firmly as we are impressed with the soundness of these views, we are not deterred from applying them to the case before us by the fact that we have not found any decisions of other courts to the same effect, nor by the fact that we are cited to a number of cases in which an opposite conclusion seems to have been reached. It is to be observed, however, with respect to the cases referred to, that most of them differ very materially from this case. In many of the instances in which new enactments have been held to repeal by implication former laws, under which alone past offenses could be punished, the changes in the law with respect to the definition or classification of offenses, or by way of mitigating the penalties of the offense, were so marked and radical as to furnish substantial grounds for holding that the legislature had intended to declare that the former law was not fit to be enforced. A notable instance of this sort is found in the celebrated Hartung case (Hartung v. People, 22 N. Y. 95, 26 N. Y. 167). Mrs. Hartung poisoned her husband at a time when the punishment prescribed by law for murder was death by hanging, to be in-

flicted within a short time after sentence. Subsequently the law was so altered as to prescribe as the penalty for the same offense imprisonment in the penitentiary at hard labor for one year, after which the convict was to be hanged only in case the governor should in his discretion issue his warrant directing the execution of the death sentence. The result of the various proceedings in the case and of the two appeals was that Mrs. Hartung was discharged upon the ground that as to her offense the new law was ex post facto, and the old law repealed without any saving clause as to past offenses. But besides the various special reasons impelling the court to that conclusion, which have no application to this case, there was this additional and sufficient reason why the court could not hold the new law wholly inoperative: Not only was the old law so changed by the amendatory act as practically to substitute life imprisonment for death by hanging as the penalty for murder, but the death penalty was absolutely abolished in some cases, where before it had been provided. Under such circumstances, the court might well say that the enactment of the new statute was equivalent to a legislative declaration that the old law was not fit to exist. And this, it seems, is the principle upon which repeals by implication, in case of the revision of the penal statutes, rests. By the revision the legislature is supposed to have declared that the former law is not fit to exist: Flaherty v. Thomas, 12 Allen, 435. The principle is intelligible enough and reasonable enough when applied to a revision which changes the classification or definition of offenses, or which sensibly mitigates the penalties formerly imposed upon the same offenses. But where, as in the case before us, the definition of the offense is in no wise changed; where the punishment, instead of being mitigated, is, according to the argument, enlarged; and where the manifest and only object of the legislature was to change the place, the time, and the officer for carrying out the sentence of death—it seems little short of absurd to hold that this amounts to a legislative declaration that the former law is not fit to exist. We think, on the contrary, that there is here no such declaration, and that we may safely hold, as we do hold, that, since the act of 1891 cannot operate as it was intended to operate, and since the partial operation it might have would defeat the evident intention of the legislature, and produce consequences which,

if foreseen, would have prevented the passage of the amendments, the whole act is unconstitutional and void; that it never took effect, and the old law remains in force. This conclusion is to some extent opposed to that reached by this court in People v. Tisdale, 57 Cal. 104; but the ground of our decision herein was not discussed or at all considered in that case, and, since no vested rights are dependent upon the former decision, it cannot be regarded a binding precedent. The judgment and order appealed from are affirmed.

We concur: McFarland, J.; Sharpstein, J.; Paterson, J.

HARRISON, J., Dissenting.—I regret that I am unable to concur in the foregoing opinion and judgment. I concur in that portion thereof which holds that the effect of the amendments of 1891 is to make such a change in the punishment prescribed for murders committed prior to their enactment as to bring them within the definition of an ex post facto law, and, therefore, that the punishment therein prescribed cannot be inflicted upon the defendant. I do not, however, concur in the conclusion deduced therefrom that we must, for this reason, conclude that the legislature did not intend that such result should follow, or that, if it had known that such would have been the result, it would not have enacted the amendments. Neither do I concur in the construction given to the amendments that the punishment for offenses committed while the former law was in force is so connected with that prescribed for future offenses that we must hold that the legislature did not intend that offenses thereafter committed should be punished in the mode prescribed by the amendments, unless prior offenses could be also punished in the same manner. The rule which generally obtains in the construction of statutes is that when a statute is re-enacted with certain additions, then for the first time made a part of the law, the provisions of the new act which are reproduced from the old and re-enacted are deemed to be mere continuations of the former law, rather than a repeal and a re-enactment thereof, and that the portions of the former statute which are omitted from the new are repealed, and are from that time to be regarded as never having been a part of the law, while the new portions are to be regarded as then for the first time presenting the rule of conduct, and are limited in their operation and effect

to acts thereafter to be done. It was held in Billings v. Harvey, 6 Cal. 381, that section 24, article 4, of the constitution of this state, providing that "no law shall be revised or amended by reference to its title, but in such case the act revised or section amended shall be re-enacted and published at length," prescribed a different rule of construction, and that by virtue of this constitutional provision "the re-enactment creates anew the rule of action, and, even if there was not the slightest difference in the phraseology of the two, the latter alone can be referred to as the law, and the former stands to all intents as if absolutely and expressly repealed." This rule of construction was afterward reaffirmed by the court in Billings v. Hall, 7 Cal. 3; Morton v. Folger, 15 Cal. 284; Clarke v. Huber, 25 Cal. 594; Bensley v. Ellis, 39 Cal. 313; People v. Tisdale, 57 Cal. 104. A similar ruling was made in Texas (State v. Andrews, 20 Tex. 230) and in Alabama (Wilkinson v. Ketler, 59 Ala. 306).

Section 325 of the Political Code provides: "Where a section or part of a section is amended it is not to be considered as having been repealed and re-enacted in the amended form, but the portions which are not altered are to be considered as having been the law from the time when they were enacted, and the new provisions are to be considered as having been enacted at the time of the amendment." If the rule of construction applied in the foregoing cases is derived from the constitution, as was held in Billings v. Harvey, it would seem that the legislature could not by statute change this rule. In Central Pac. R. R. Co. v. Shackelford, 63 Cal. 268, the decision appears to have been made in accordance with the rule laid down in this section of the Political Code, although it is not referred to in the opinion, nor is there any reference to the above decisions, with which it is apparently in conflict. It is, however, unnecessary for the purposes of this case to determine whether the rule laid down in Billings v. Harvey or that prescribed by the Political Code is to prevail, inasmuch as the portions of the statute which are retained in the amended sections do not call for so much consideration as does the effect of those portions then first enacted, compared with the portions of the sections omitted from the re-enactment. Under well-established rules of construction the portions of the original sections which are omitted from the amendments are

deemed to have been thereby repealed, and the portions then for the first time enacted are held to constitute the rule of action in reference to the subject matter therein expressed. All laws are prospective in their operation unless they contain express provision for making them retroactive; and laws prescribing punishment for crimes are essentially limited to future violations of the law creating the offense. Section 3 of the Penal Code declares that "no part of this code is retroactive, unless expressly so declared."

The proposition contended for by the appellant is that by these amendments the punishment imposed for the offense has been changed to his disadvantage, as well as increased, and that, as the legislature provided no saving clause in the statute for offenses committed prior to its passage, as was done in the statute under consideration in People v. Gill, 7 Cal. 356, and as was provided in section 6 of the Penal Code at the time of the enactment of that code, there can be no punishment inflicted upon him for his offense, either under the old statute, for the reason that the punishment thereby prescribed has been repealed, or under the new, as that prescribes a punishment different from and greater than was provided when the offense was committed, and, being ex post facto, is therefore unconstitutional and void. The effect of the repeal of a criminal law is to prevent any further action thereunder. By its removal from the statute-book the court is devested of all authority to try the accused, or, if tried, to pronounce judgment against him. It is immaterial at what stage of the proceeding the repeal takes place. If before trial, the defendant cannot be tried; if after conviction, and before judgment, he cannot be sentenced; if after judgment, and before sentence, he cannot be punished. Unless the proceedings have passed into final judgment, and beyond the necessity of any further action by the court, a repeal of the statute which makes the act an offense, or which defines the punishment for the offense, deprives the court of all further jurisdiction. Whenever the court is called upon to take any step or do any act which directly or in its consequences will have the effect to punish the defendant for any act done by him, it must find its authority therefor in a statute then existing and in force; and if, subsequent to the commission of the offense, the punishment prescribed therefor has been changed, without any saving clause

for previous offenses, the court is devested of all authority to impose such punishment, and must punish the offender in conformity with the amended statute, unless restricted therefrom by constitutional provisions. "The repeal of a statute puts an end to all prosecutions under the statute repealed, and to all proceedings growing out of it, pending at the time of the repeal. There can be no legal conviction unless the act· is contrary to law at the time it is committed, nor can there be a judgment unless the law is in force at the time of the indictment and of the judgment": Sedg. St. & Const. Law, p. 130. Mr. Bishop says: "No proceedings can be carried on under a law which, being repealed, is not existing to give authority to the court; consequently, if the common or statutory law which authorized a prosecution and conviction for a specific offense is repealed, or expired before final judgment, the court can go no further with the case. Even if a verdict has been rendered against the prisoner, sentence cannot be pronounced, and he must be discharged": Bish. St. Crimes, sec. 177. "When an act of parliament is repealed it must be considered, except as to transactions past and closed, as if it had never existed": Dwar. St. 160. The repeal of a penal statute takes away all right of action for the recovery of the penalty therefor: Norris v. Crocker, 13 How. 429, 14 L. Ed. 210; Breitung v. Lindauer, 37 Mich. 230. "The repeal obliterates the statute as if it had never been passed, and obliterates the penalties as if they had never existed": Rood v. Railroad Co., 43 Wis. 153. "The repeal of the law imposing the penalty is of itself a remission": Per Taney, C. J., in Maryland v. Railroad Co., 3 How. 552, 11 L. Ed. 722. In Yeaton v. United States, 5 Cranch, 281, 3 L. Ed. 101, Chief Justice Marshall said: "After the expiration or repeal of a law no penalty can be enforced or punishment inflicted for violations of the law committed while it was in force, unless some special provision be made for that purpose by statute."

In 1860 the legislature of New York passed an act changing the punishment for murder, and repealing the prior law for the punishment of that offense, by virtue of which it was held by the court of appeals of that state that the legislature had so interfered with the laws for the punishment of the crime of murder that a particular class of offenders, embracing the prisoner, could not be punished at all. The effect of this was

that all murders which had been committed prior to the passage of that act, and for which the trial, conviction, and sentence had not taken place, escaped all punishment: Hartung v. People, 22 N. Y. 95, 26 N. Y. 167. In State v. Daley, 29 Conn. 272, the defendant was convicted in July, 1860, of manslaughter committed in May of that year. By an act passed by the legislature which took effect after the commission of the offense, and prior to the trial and conviction of the defendant, a change was made in the punishment of manslaughter from imprisonment in the state prison for a term not less than two nor more than ten years, to imprisonment in the state prison or county jail for a term not exceeding ten years. The court held that, as the statute was prospective only, without any saving clause, the defendant could not be punished, for the reason that the effect of the repeal without any saving clause was to leave no sanction or punishment for that crime applicable to previous offenders. "The effect of such repeal was, for the most obvious reason, that the law as to any proceedings under it which were not past and closed must be considered as if it had never existed, and therefore furnishes no authority after its repeal for the commencement of any proceedings, or for the further prosecution of any which had been before commenced. Hence it has been often decided that, if a provision of either the statutory or common law, which authorizes a prosecution and conviction for a specific offense, is repealed before final judgment, the court can proceed no further with the case, and that sentence cannot be pronounced, even although a verdict has been rendered against the prisoner, and he must therefore be discharged.'' In State v. Campbell, 44 Wis. 529, the defendant was charged with the embezzlement of public funds committed in 1876. Before his trial under the charge the legislature revised the law of the state relative to embezzlement by an act which went into effect January 1, 1878. Upon a motion in arrest of judgment the court held that, inasmuch as the revising act contained no saving clause, authorizing a prosecution for offenses already committed, there is no law which would authorize or sustain a judgment on the verdict saying: "It is true, by this construction all offenses committed by public officers under the Revised Statutes of 1858, which were not prosecuted to judgment prior to the new law taking effect, will go unpunished, but this con-

sequence must rest upon the legislature, and not the courts. The legislature could easily have avoided such a result by enacting a proper saving clause in chapter 340. As the law now stands, we must hold that there is no statute under which it can be punished. We may deplore this, but it is beyond our power to help it without a violation of well-settled principles of law.''

In United States v. Tynen, 11 Wall. 88, 20 L. Ed. 153, the defendant had been indicted for an offense committed against the naturalization laws, and while the matter was pending on appeal to the supreme court Congress passed an act embracing the whole subject of frauds against the naturalization laws. The supreme court, in disposing of the question, held that, although there was no express repeal of the law under which the defendant was indicted, yet as the provisions of the subsequent act were repugnant to those of the former, it operated as a repeal, saying: ''There can be no legal conviction, nor any valid judgment pronounced upon conviction, unless the law creating the offense be at the time in existence. By the repeal the legislative will is expressed that no further proceedings be had under the act repealed.'' In Flaherty v. Thomas, 12 Allen, 428, the statute imposing the penalty for an offense was changed after the commission of the act to such an extent that it was held by the court to be a repeal of the former statute, and that the defendant could not be punished, saying: ''All criminal statutes are limited in effect, and usually in terms, to future offenses. The establishment of a new rule of punishment is of itself a legislative declaration that the previous rule is not fit to exist, and therefore shall not be applied to any case unless the legislature, in order to prevent offenses already committed from going unpunished, provides that such offenses shall continue to be punished according to the previous laws. It is clearly settled by authority that, in the absence of any such provision, the old law cannot be resorted to after the new law has taken effect for the punishment of an offense committed before the passage of the latter, even if the defendant has been already convicted by the verdict of a jury.'' In People v. Tisdale, 57 Cal. 104, it was held that an amendment in 1880 to section 607 of the Penal Code, by which the punishment for an offense was changed from a ''fine not exceeding one thousand dollars, or imprisonment in the state prison not

exceeding two years," to a fine "not less than one hundred dollars nor more than one thousand dollars, or by imprisonment in the county jail not exceeding two years, or by both," operated as a repeal of the former statute, and that, as the defendant was not charged with a violation of the statute as it stood after the amendment, he could not be punished under an information filed for a violation of the law before it was repealed: See, also, Commonwealth v. Kimball, 21 Pick. 373; Commonwealth v. McDonough, 13 Allen, 581; Kring v. Missouri, 107 U. S. 221, 27 L. Ed. 506, 2 Sup. Ct. Rep. 443; Garvey v. People, 6 Colo. 559, 45 Am. Rep. 531; In re Petty, 22 Kan. 477; Lindzey v. State, 65 Miss. 544, 7 Am. St. Rep. 674, 5 South. 99; Shepherd v. People, 25 N. Y. 406; Ratzky v. People, 29 N. Y. 124.

By omitting from the sections as amended the provisions authorizing the judgment to be executed by the sheriff, and within the county where the conviction was had, the legislature deprived the court of all power to authorize such execution by the sheriff, or within the county jail, and also took from the sheriff all capacity to execute the judgment. The amendments had the effect to obliterate from the statute all the provisions that were not re-enacted, as completely as if they had never formed a part thereof. The omitted portions became as if they had never existed, and the new portions are to be construed as if none had preceded them.

It is urged by the attorney general that, in case it shall be held that the sections as amended provided for a greater punishment than the original sections, such provision would be unconstitutional and void, and that, therefore, the amended sections are themselves unconstitutional and inoperative to effect a repeal of the former sections; and it is held in the prevailing opinion that, because it is unconstitutional to apply the punishment prescribed by the amendments to one convicted of an offense committed prior thereto, the amendments are thereby affected with such an unconstitutional element that it defeats their operation in reference to offenses subsequently committed. It is undoubtedly a correct proposition that the provisions of a statute will not be affected by a subsequent unconstitutional act of the legislature, and that a clause in such act, repealing all other acts which are inconsistent therewith, will not affect the prior statute. The uncon-

stitutional act is to be regarded as wholly void, and inoperative, even for the purpose of displacing or overruling that for which it is sought to be made a substitute: Ex parte Davis, 21 Fed. 396; Tims v. State, 26 Ala. 165; State v. Crozier, 12 Nev. 300; State v. Hallock, 14 Nev. 202, 33 Am. Rep. 559; In re Petty, 22 Kan. 489; Campau v. Detroit, 14 Mich. 276. It is also a fundamental rule of construction that a statute is not to be declared unconstitutional unless it be clearly so, and also that, "if the statute is susceptible of two constructions, one of which is consistent and the other inconsistent with the restrictions of the constitution, it is the plain duty of the court to give it that construction which will make it harmonize with the constitution, and comport with the legitimate powers of the legislature": People v. Frisbie, 26 Cal. 139. The legislature is not presumed to have intended to pass an unconstitutional act, and, unless the act clearly falls within some express prohibition of the constitution, or is beyond the power of the legislature, it is the duty of the courts to uphold, rather than to set it aside. All laws are presumed to have been passed with deliberation, and with a knowledge on the part of the legislature of the existing laws, and any statute, purporting either expressly or impliedly to repeal an existing law, is deemed to have been passed with the intent on the part of the legislature to make such change.

There is nothing in the terms of the sections as amended in 1891 which is repugnant to any provision of the constitution or beyond the powers of the legislature to adopt. It will not be disputed that it was entirely competent for the legislature, when originally defining crimes and their punishment, to provide that judgment of death should in all cases be carried into effect by the warden of a state prison and within its walls. Its power in this respect was not exhausted by its first exercise. It has the same power to-day to prescribe a different punishment for any crime that it originally had to fix the punishment therefor. It was within the power of the legislature to abolish capital punishment. It could even grant an amnesty for all murderers by simply repealing the section providing for their punishment; and, however much we may conjecture that the legislature would not purposely free a criminal from punishment, or however much we may think that it did not in the present case intend to grant an amnesty

for any offense, we can only determine its intent by what it has said. "The result may or may not be conformable to the actual intent of those who passed the latter statute. We can only ascertain the legal intent of the legislature by the language which they have used, applied, and expounded conformably to the settled and well-known rules of construction": Commonwealth v. Kimball, 21 Pick. 376. "If the legislature by the act of 1860 carelessly or unintentionally repealed the law punishing the prisoner's crime, that is no reason why reasonable and well-settled principles of construction should be disregarded for the purpose of punishing it under that act": Shepherd v. People, 25 N. Y. 411. "It is not a sufficient answer to the difficulty to say that the members of the legislature did not probably intend to grant impunity to offenders in the situation of the prisoner. They did intend to abrogate as to her and as to all persons in the same situation the former punishment, and that design they effectually carried out. They intended also that such offenders should be punished in another way, but this they could not effect on account of the constitutional inhibition": Hartung v. People, 26 N. Y. 170. "The legislature might have inserted in the repealing act a saving clause, which would have prevented the defendant's escape, if they had seen fit to do so. If they omitted it through mistake, the court cannot correct the mistake. Nor have we a right to decide that the omission was by mistake": Commonwealth v. McDonough, 13 Allen, 585. The legislature has done no act, nor has it given utterance to any expression, which authorizes the inference that it did not intend the amendments to be operative unless they applied to all offenders; and I know of no other mode of ascertaining the intention of the legislature in reference to what it has enacted than the language of its act. The rules for the construction of statutes are simple, and do not vary with the subjects to which the statutes are directed. While the statement of the attorney general respecting the number of persons charged with murder who will be affected by the statute would have been properly presented to the legislature when that body had the act under consideration, it can have no weight with this court in construing the effect of the statute. If we should assume that the legislature knew that those persons would be affected by its action, and passed the amendments with such knowledge, or

that it enacted them in the belief that they would not affect such previous offenders, we must still concede that such legislation was within the powers of the legislature, and that we are not at liberty to set it aside because its effect is different from what we may infer that that body anticipated. If, on the other hand, we assume that the legislature enacted the amendments in the opinion or belief that there were no previous offenders to whom they could be made applicable, it merely results that the amendments were enacted without sufficient consideration or examination; and such has never been held a sufficient ground for disregarding the plain language of a statute. Whether we are to assume that the legislature acted advisedly or without consideration, I know of no rule of construction by which we are at liberty to investigate the extent of its knowledge, or the want of consideration it gave to its action, and therefore, in applying the well-settled rules of construction to the amendments under consideration, we are simply to determine whether the amendments themselves are by their terms inconsistent with the constitution. If an attempt is made to apply the law as found in these amendments to cases which are not within their terms, it results that in the instance in which such attempt is made there is but the not unusual case of an offense against society, for the punishment of which the law has not made adequate provision. It cannot be questioned that it was the intention of the legislature by the amendments under consideration to provide that all judgments of death should thereafter be executed within the walls of a state prison. It has specifically declared this intent in express language, and, if there had been no murder committed in this state prior to the passage of the act of 1891, the intent of the legislature as to the place of punishment would have been undoubted. By thus amending these sections of the Penal Code, it has as effectually shown its intent to repeal the former provisions for the place in which the punishment of death should be executed, as if it had shown its intention by abrogating those provisions in express language.

It is conceded in the argument on behalf of the people that, if the amendatory statute had contained a saving clause for the punishment of crimes committed prior to its passage, there would have been no constitutional objection to its validity. The omission of such saving clause cannot, however, make in-

valid a law which would otherwise be valid. The constitutionality of its provisions is to be determined by their own harmony with the constitution, and not by the effect which additional provisions would have had upon the subject matter to which the act is applied. The statute, as amended, is not in its terms unconstitutional. Its unconstitutionality does not spring from any provision which is contained therein, but arises only when it is sought to apply its provisions to cases which are not within its terms. This is not, however, a defect which is inherent in the statute, but is a want of power to apply the statute to cases for which it makes no provision, and results from the application of other principles of the constitution which are intended for the protection of individual rights, and which are equally sacred and potent as those which are made for maintaining government or for the punishment of crime. A law which it is within the power of the legislature to pass is constitutional, although it may be unconstitutional to apply it to acts or prosecutions had prior to its passage.

In the same clause of the constitution which prohibits the passage of ex post facto laws is the prohibition of laws impairing the obligation of contracts. The statute-books of the several states, as well as of this state, contain many laws of a general nature which violate this latter provision, and which have been held constitutional in their application· to future transactions, although inoperative as to prior ones. Under the rule for amendment provided by the constitution, any section of the codes is to be amended by its re-enactment as amended. In civil matters no saving clause is required. The former law is held to have entered into the contract to such an extent as to be beyond the power of the legislature to deprive the parties to the contract of the rights thereby acquired; but in matters of criminal legislation, unless the saving clause is contained in the amended section, the state, as represented by the legislature, is deemed to have remitted the penalty incurred in the commission of the offense. The amended section is not unconstitutional, but it is unconstitutional to apply it to transactions had prior to its passage. ''A legislative act may be entirely valid as to some classes of cases, and clearly void as to others. A general law for the punishment of offenses, which should endeavor to reach, by its retroactive operation, acts before committed, as well as to prescribe a rule of conduct

for the citizen in future, would be void, as far as it was retrospective, but such invalidity would not affect the operation of the law in regard to the cases which were within the legislative control": Cooley Const. Lim., p. 213; Jaehne v. New York, 128 U. S. 189, 32 L. Ed. 398, 9 Sup. Ct. Rep. 70; State v. Amery, 12 R. I. 64; United States v. Hall, 2 Wash. C. C. 373, Fed. Cas. No. 15,285.

The principle contained in the prevailing opinion in this case leads necessarily to this result: either that any amendment to that portion of the Penal Code defining crimes and punishments which the legislature may enact without a saving clause for prior offenders is ipso facto unconstitutional, and without its power to enact, or that its validity is to depend upon the conjecture of the individuals who may be the members of this court respecting the intention of the individuals who may have been members of the legislature at the time the amendment was enacted. If the doctrine be correct that because a law which is prospective in its operation, and which in terms is consistent with the constitution, is unconstitutional as to future offenses because it cannot be applied to past offenses, it must follow that the court has imposed a restriction upon the legislature which is not found in the constitution. If, on the other hand, such law is to be declared unconstitutional whenever the members of this court shall be of the opinion that the legislature did not intend what it has expressly and unqualifiedly declared, the certainty of law is substituted by the conjecture or will of the court. "Misera est servitus ubi jus est vagum aut incertum." In none of the instances wherein similar legislation has been construed by the courts of other states has it been even suggested that such legislation was unconstitutional for the reason that its effect could not have been anticipated by the legislature; and, although the decisions of those courts have no binding authority upon us, yet, in a matter which involves only the determination of the proper rules of construction in criminal law, the unanimity of decision in other states is an authority of the most persuasive character. And the rule of construction is the same whether the statute to be construed has reference to the punishment of the highest crime defined in the law or to the slightest misdemeanor. These rules are as uniform for

all laws as is the constitutional prohibition against an ex post facto law.

The rule that a statute which is in part unconstitutional will be declared wholly so is applicable only when it can be seen from the act itself that the unconstitutional part is the "condition or consideration" upon which the other part was enacted, or that the two parts are so interdependent that one cannot exist without the other. If the different parts are separable, or if the subjects to which the act may have a constitutional application are separable from the others, it will not be declared unconstitutional. This rule was laid down with his usual clearness by Chief Justice Shaw in Warren v. Mayor, 2 Gray, 99, where he limits such result to a case where the parts of the statute "are so mutually connected with and dependent on each other as conditions and considerations or compensations for each other as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently." In the case of Fisher v. McGirr, 1 Gray, 21, 61 Am. Dec. 381, that able jurist had said "that, where a statute has been passed by the legislature under all the forms and sanctions requisite to the making of laws, some part of which is not within the competency of legislative power, or is repugnant to any provision of the constitution, such part thereof will be adjudged void and of no avail, whilst all other parts of the act not obnoxious to the same objection will be held valid, and have the force of law." There is nothing in the statute under consideration indicating that the punishment of previous offenders according to its terms was a condition or consideration for providing that subsequent offenders should be so punished, nor is the punishment of these classes in any respect so interdependent that the one cannot exist without the other. The statute presents the not infrequent case of a law applicable to certain acts, but inapplicable to others by reason of the paramount law. The intention of the legislature, as expressed in its language, is that it shall be applicable to all cases, but this intention cannot be carried out as to certain cases by reason of a constitutional inhibition.

In Telegraph Co. v. Texas, 105 U. S. 460, 26 L. Ed. 1067, a statute of the state of Texas provided for a tax upon every telegraphic message sent by any company doing business

within the state. The court held that the act was unconstitutional, in so far as it was applicable to messages sent out of the state, but valid as to those sent within the state, applying the same principles which had previously been held by it in the case of State Freight Tax, 15 Wall. 232, 21 L. Ed. 146: See, also, Steamship Co. v. Pennsylvania, 122 U. S. 339, 30 L. Ed. 1202, 7 Sup. Ct. Rep. 1118. In a similar case (Fargo v. Michigan, 121 U. S. 241, 30 L. Ed. 893, 7 Sup. Ct. Rep. 857) the court said: ''The taxing law of the state was, therefore, valid as to the latter class of transportation, but with regard to the others it was invalid, because it was interstate commerce, and the state could lay no tax upon it.''

In 1880 various acts were passed amending the sections of the Penal Code for the purpose of adapting them to the new constitution, many of which affected the punishment previously prescribed for offenses, but none of these acts contained any saving clause for prior offenses. In 1874 section 190 of the Penal Code was amended by giving to the jury the discretion to award punishment in the state prison for life instead of death, as the penalty for murder in the first degree: Amend. Code, 1873–74, p. 457. In 1889 section 261 of the Penal Code, defining rape, was amended by making the age of consent fourteen years, instead of ten: Stats. 1889, p. 223. In neither of these statutes was there any saving clause for prior offenses. Very many other sections of the Penal Code have been amended by the legislature without making provision for the effect of such amendments upon previous offenders. If I correctly apprehend the principles maintained in the prevailing opinion herein, any of these amendments to the Penal Code is unconstitutional if it can be shown that at the time of its enactment there were cases pending in court in which individuals charged with crime might have gone unpunished by reason of the statute in force when the crime was committed having been repealed by the amendment. The invalidity of the statute cannot depend upon the fact that the person then charged with the crime did not avail himself of such defense. The statute is to be tested by the conditions existing when it was passed; and, if it would at that time have been declared unconstitutional for that reason, it is equally so to-day, and its unconstitutionality can be invoked by anyone against whom it is sought to be enforced. If the amendments of 1891

are unconstitutional for the reasons given in the prevailing opinion, they could not be enforced against one who committed murder after their enactment, even though those whose crimes were committed prior thereto did not assert such unconstitutionality. If at the time of the amendment of section 190 in 1874, there were persons charged with murder prior to that date, that act, as it now stands upon the statute-book, must be construed unconstitutional, for the reason that it provided such a possible change for the punishment of an offender as to be within the inhibition of an ex post facto law. I do not think that such a conclusion can be maintained, and for that reason I cannot concur in the conclusion reached by the majority of the court in the present case.

In reaching the conclusion that the amendments to the Penal Code in 1891 have so changed the punishment for the offense of which the defendant was convicted that it cannot be imposed upon him, and that there is no existing law for the punishment of his offense, I have not failed to consider that the crime committed by him must go unpunished, but, however much this result may be regretted, it is not for this court to prevent it. The criminal, as well as the upright, is entitled to be protected in the rights guaranteed to him by the constitution. That instrument has been framed as the basis and limit of all legislation, and the lowest, as well as the highest, is entitled to its protection. It is one of the functions of this tribunal to prevent hasty or ill-considered legislation from infringing upon the limitations therein prescribed; and, however great might be our desire, we cannot avoid the responsibility of declaring such legislation inoperative, even though the effect of our decision be that crimes will go unwhipped of justice, or criminals be restored to society. "It is better that any criminal shall go unpunished than that any provision of the constitution shall be disregarded, or that the foundations of the criminal law shall be unsettled": Lindzey v. State, supra. "Though it is desirable that all offenders against our penal laws should be punished, yet it is better that one should occasionally escape than that the fundamental principles of the criminal law should be violated": Commonwealth v. McDonough, supra. In my opinion, the judgment of the court below should be affirmed; but inasmuch as, since it was pronounced, the legislature has so changed the law as to deprive

the court of the power to enforce its judgment, that court should be directed, upon the filing of the remittitur therein, to enter an order discharging the defendant from custody.

I concur in the foregoing opinion of Mr. Justice Harrison: De Haven, J.

I concur: Garoutte, J.