# MEDLEY, Petitioner.

## ORIGINAL.

No. 5, Original.　Argued and submitted January 15, 1890. — Decided March 3, 1890.

A state statute, (enacted after the commission of a murder in the State,)
which adds to the punishment of death, (that being the punishment
when the murder was committed,) the further punishment of imprison-
ment by solitary confinement until the execution, is, when attempted to
be enforced against the person convicted of that murder, an *ex post facto*
law, and a sentence inflicting both punishments upon him is void; and
the same is the case with a statute which confers upon the warden of the
penitentiary the power to fix the day of execution, and compels him to
withhold the knowledge of it from the offender, when neither of those
provisions formed part of the law of the State when the offence was
committed.

Any law passed after the commission of the offence for which a person
accused of crime is being tried which inflicts a greater punishment on
the crime than the law annexed to it at the time when it was committed,
or which alters the situation of the accused to his disadvantage, is an
*ex post facto* law within the meaning of that term as used in the Constitu-
tion of the United States.

No one can be criminally punished in this country except according to a law
prescribed for his government by the sovereign authority before the

imputed offence was committed, or by some law passed afterwards by which the punishment is not increased.

There being no error in the proceedings of the court below on the trial and the verdict by which the party was convicted, and the error commencing only when the sentence or judgment of the court on the verdict is entered, the court, after deliberation, determines that the Attorney General of the State shall be notified by the warden of the penitentiary, of the precise time when he will release the prisoner from his custody, at least ten days beforehand, and after doing this, and at that time, he shall discharge the prisoner.

THE case is stated in the opinion.

*Mr. Walter Van Rensselaer Berry* and *Mr. Henry Wise Garnett* (with whom was *Mr. A. T. Britton* on the brief) for the petitioner.

*Mr. Henry M. Teller*, and *Mr. Aaron W. Jones*, attorney general of the State of Colorado, submitted on their brief.

MR. JUSTICE MILLER delivered the opinion of the court.

This is an application to this court by James J. Medley for a writ of *habeas corpus*, the object of which is to relieve him from the imprisonment in which he is held by J. A. Lamping, warden of the state penitentiary of the State of Colorado.

The petitioner is held a prisoner under sentence of death pronounced by the District Court of the Second District of the State of Colorado for the county of Arapahoe. The petition of the prisoner sets forth that an indictment for the murder of Ellen Medley was found against him by the grand jury of Arapahoe County on the 5th day of June, 1889; that the indictment charges petitioner with this murder, which took place on the 13th day of May of that year; that he was tried in said District Court on the 24th day of September thereafter and found guilty by the jury of murder in the first degree; that on the 29th day of November he was sentenced to be remanded to the custody of the sheriff of Arapahoe County, and within twenty-four hours to be taken by said sheriff and delivered to the warden of the state penitentiary,

to be kept in solitary confinement until the fourth week of the month of December thereafter, and that then, upon a day and hour to be designated by the warden, he should be taken from said place of confinement to the place of execution, within the confines of the penitentiary, and there be hanged by the neck until he was dead.

Copies of the indictment, of the verdict of the jury and of the sentence of the court are annexed to the petition as exhibits.

The petitioner then sets forth that he was sentenced under the statute of Colorado, approved April 19th, 1889, and which went into effect July 19th, 1889, and repealed all acts and parts of former acts inconsistent therewith, without any saving clause, and that the crime on account of which the sentence was passed was charged to be and was actually committed on the 13th day of May of the same year.

The petitioner enumerates some twenty variances between the statute in force at the time the crime was committed and that under which he was sentenced to punishment in the present case, all of which are claimed to be changes to his prejudice and injury, and therefore *ex post facto* within the meaning of section 10, article 1 of the Constitution of the United States, which declares that no State shall pass any bill of attainder or *ex post facto* law.

The petitioner applies directly to this court for the writ of *habeas corpus* instead of to the Circuit Court of the United States, because, he alleges, that court has in a similar case, involving the same points, decided adversely to the petitioner.

Upon examining the petition and the accompanying exhibits an order was made that the writ should issue and be returnable forthwith. By an arrangement between the parties and the counsel, it was agreed that the prisoner need not in person be brought to Washington. The case was therefore heard on the documents and transcripts of record presented to the court, and the only question argued before us was whether the act of April 19, 1889, which by the Constitution of the State of Colorado became operative on the 19th day of July thereafter, and under which the sentence complained of was im-

posed by the District Court, is an *ex post facto* law, so as to be void under the provision of the Constitution of the United States on that subject, and if so, in what respect it is in violation of that constitutional provision.

This statute will be found in the Session Laws of the State of Colorado of 1889, page 118, and is as follows:

" An Act relative to the time, place and manner, of infliction of the death penalty, and to provide means for the infliction of such penalty; and making it a misdemeanor, punishable by fine or imprisonment, to disclose or publish proceedings in relation thereto.

" *Be it enacted by the General Assembly of the State of Colorado.*

"Section 1. The commissioners of the state penitentiary, at the expense of the State of Colorado, shall provide a suitable room or place enclosed from public view within the walls of the penitentiary, and therein erect and construct, and at all times have in preparation, all necessary scaffolding, drops, and appliances requisite for carrying into execution the death penalty; and the punishment of death must, in each and every case of death sentence pronounced in this State, be inflicted by the warden of the said state penitentiary in the room or place and with the appliances provided as aforesaid, by hanging such convict by the neck until he shall be dead.

" Sec. 2. Whenever a person convicted of a crime, the punishment whereof is death, and such convicted person be sentenced to suffer the penalty of death, the judge passing such sentence shall appoint and designate in the warrant of conviction a week of time within which such sentence must be executed; such week, so appointed, shall be not less than two nor more than four weeks from the day of passing such sentence. Said warrant shall be directed to the warden of the state penitentiary of this State, commanding said warden to do execution of the sentence imposed as aforesaid, upon some day within the week of time designated in said warrant, and shall be delivered to the sheriff of the county wherein such conviction is had, who shall within twenty-four hours there-

after proceed to the said penitentiary and deliver such convicted person, together with the warrant as aforesaid, to the said warden, who shall keep such convict in solitary confinement until infliction of the death penalty; and no person shall be allowed access to said convict, except his attendants, counsel, physician, a spiritual adviser of his own selection and members of his family, and then only in accordance with prison regulations.

"SEC. 3. The particular day and hour of the execution of said sentence, within the week specified in said warrant, shall be fixed by said warden; and he shall invite to be present thereat the sheriff of the county wherein the conviction was had, the chaplain and physician of the penitentiary, one practising surgeon resident in the State, the spiritual adviser of the convict, if any, and six reputable citizens of the State of full age. Said warden may also appoint three deputies or guards to assist him in executing said sentence, and said warden shall permit no person or persons to be present at such execution except those provided for in this section. The time fixed by said warden for said execution shall be by him kept secret and in no manner divulged, except privately to the persons by him invited to be present as aforesaid; and such persons so invited shall not divulge such invitation to any person or persons whomsoever nor in any manner disclose the time of such execution. All persons present at such execution shall keep whatever may transpire thereat secret and inviolate, save and except the facts certified to by them as hereinafter provided. No account of the details of any such execution, beyond the statement of the fact that such convict was on the day in question duly executed according to law at the state penitentiary, shall in any manner be published in this State.

"SEC. 4. Upon receiving notice from said warden of such execution, it shall be the duty of said sheriff to be present and witness such execution; and [he] shall receive and cause the certified transcript of record of said execution, hereinafter specified, to be filed within ten days after said execution, in the office of the clerk of the court in which said conviction was had;

and the said clerk shall record said transcript at length in the records of the said case. In case of the disability, from illness, or other sufficient cause, of said warden or said sheriff to be present at such execution, it shall be the duty of their respective deputies, acting in their place and stead, to execute said warrant, and to perform all other duties in connection therewith and by this act imposed upon their principals.

"SEC. 5. Said warden shall keep a book of record, to be known as record of executions, in which shall be entered at length the reports hereinafter specified. Immediately after said execution a *post mortem* examination of the body of the convict shall be made by the attending physician and surgeon, and they shall enter in said book of record the nature and extent of such examination, and sign and certify to the same. Said warden shall also immediately make and enter in said book a report setting forth the time of such execution, and that the convict (naming him) was then and there executed in conformity to the sentence specified in the warrant of the court (naming such court) to him directed, and in accordance with the provisions of this act, and shall insert in said report the names of all the persons who were present and witnessed said execution, and shall procure each and every of such persons to sign said report with their full name and place of residence before leaving the place of execution ; and said warden shall thereupon attach his certificate to said report, certifying to the truth and correctness thereof, and shall immediately deliver a certified transcript of said record entry to said sheriff.

"SEC. 6. Any person who shall violate or omit to comply with section three of this act shall be guilty of a misdemeanor, and upon conviction thereof be punished by a fine of not less than fifty dollars nor more than five hundred dollars or by imprisonment in the county jail for not less than thirty days nor more than six months.

"SEC. 7. The warden, or other person acting in his stead who performs the duties imposed upon him by this act, shall be paid for his services out of the moneys provided for the maintenance of said state penitentiary the sum of fifty (50)

dollars; and the said sheriff shall be paid for his services by the county where such conviction was had the sum of twenty-five dollars, together with his mileage fees as provided by law.

"SEC. 8. All acts and parts of acts inconsistent with the provisions of this act are hereby repealed.

"Approved April 19, 1889."

Section 19 of Article V of the Constitution of the State of Colorado, as amended November 4, 1884, is as follows:

"No act of the general assembly shall take effect until ninety days after its passage, unless in case of emergency (which shall be expressed in the preamble or body of the act) the general assembly shall, by a vote of two-thirds of all the members elected to each house, otherwise direct. No bill except the general appropriation for the expenses of the government only, introduced in either house of the general assembly after the first twenty-five days of the session, shall become a law."

We think it follows from this provision that neither the repealing clause nor any other part of this act was in force prior to the 19th of July, 1889, and that the crime, having been committed in May of that year, was to be governed in all particulars, of trial and punishment, by the law then in force, except so far as the legislature had power to apply other principles to the trial and punishment of the crime. If these were conducted and administered under the law of 1889, which became a law after the commission of the offence, and its provisions so far as applied by the court to the case of the prisoner, were such invasions of his rights as to properly be called *ex post facto* laws, they were void.

It is unnecessary to examine all the points in which, according to the argument for plaintiff, the new statute was *ex post facto;* therefore we shall notice only a few of those which appear to us most deserving of attention, and in doing this we shall compare the new statute with the one which it superseded and repealed.

Opinion of the Court.

The first of these, and perhaps the most important, is that which declares that the warden shall keep such convict in solitary confinement until the infliction of the death penalty. The former law, the act of 1883, contained no such provision. It declared that every person convicted of murder in the first degree should suffer death, and every person convicted of murder of the second degree should suffer imprisonment in the penitentiary for a term of not less than ten years, which might extend to life; and it declared that the manner of inflicting the punishment of death should be by hanging the person convicted by the neck until death, at such time as the court should direct, not less than fifteen nor more than twenty-five days from the time sentence was pronounced, unless for good cause the court or governor might prolong the time. The prisoner was to be kept in the county jail under the control of the sheriff of the county, who was the officer charged with the execution of the sentence of the court. Solitary confinement was neither authorized by the former statute, nor was its practice in use in regard to prisoners awaiting the punishment of death.

This matter of solitary confinement is not, as seems to be supposed by counsel, and as is suggested in an able opinion on this statute, furnished us by the brief of the counsel for the State, by Judge Hayt, (in the case of Henry Tyson,) a mere unimportant regulation as to the safe-keeping of the prisoner, and is not relieved of its objectionable features by the qualifying language, that no person shall be allowed access to said convict except his attendants, counsel, physician, a spiritual adviser of his own selection, and members of his family, and then only in accordance with prison regulations.

Solitary confinement as a punishment for crime has a very interesting history of its own, in almost all countries where imprisonment is one of the means of punishment. In a very exhaustive article on this subject in the American Cyclopædia, Volume XIII, under the word "Prison" this history is given. In that article it is said that the first plan adopted when public attention was called to the evils of congregating persons in masses without employment, was the solitary prison connected

with the Hospital San Michele at Rome, in 1703, but little known prior to the experiment in Walnut Street Penitentiary in Philadelphia in 1787. The peculiarities of this system were the complete isolation of the prisoner from all human society, and his confinement in a cell of considerable size, so arranged that he had no direct intercourse with or sight of any human being, and no employment or instruction. Other prisons on the same plan, which were less liberal in the size of their cells and the perfection of their appliances, were erected in Massachusetts, New Jersey, Maryland and some of the other States. But experience demonstrated that there were serious objections to it. A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community. It became evident that some changes must be made in the system, and the *separate* system was originated by the Philadelphia Society for Ameliorating the Miseries of Public Prisons, founded in 1787.

The article then gives a great variety of instances in which the system is somewhat modified, and it is within the memory of many persons interested in prison discipline that some thirty or forty years ago the whole subject attracted the general public attention, and its main feature of solitary confinement was found to be too severe.

It is to this mode of imprisonment that the phrase solitary confinement has been applied in nearly all instances where it is used, and it means this exclusion from human associations; where it is intended to mitigate it by any statutory enactment or by any regulations of persons having authority to do so, it is by express exceptions and modifications of the original principle of "solitary confinement." The statute of Colorado is undoubtedly framed on this idea. Instead of confinement in the ordinary county prison of the place where he and his friends reside; where they may, under the control of the sheriff, see him and visit him; where the sheriff and his attendants

must see him; where his religious adviser and his legal counsel may often visit him without any hindrance of law on the subject, the convict is transferred to a place where imprisonment always implies disgrace, and which, as this court has judicially decided in *Ex parte Wilson*, 114 U. S. 417; *Mackin* v. *United States*, 117 U. S. 348; *Parkinson* v. *United States*, 121 U. S. 281; and *United States* v. *De Walt*, 128 U. S. 393, is itself an infamous punishment, and is there to be kept in "solitary confinement," the primary meaning of which phrase we have already explained.

The qualifying phrase in this statute is but a small mitigation of this solitary confinement, for it expressly declares that no one shall be allowed access to the convict except certain persons, and these are not admissible unless their access to the prisoner is in accordance with prison regulations, prescribed by the board of commissioners of the penitentiary under section 2553 of the laws of Colorado in force since 1877. This section declares that "the board of commissioners of the penitentiary shall make such rules and regulations for the government, discipline and police of the penitentiary, and *for the punishment of prisoners confined*, not inconsistent with law, as they deem expedient." What these may be at any particular time is unknown. How far they may permit access of counsel, physicians, the spiritual adviser, and the members of his family, is a matter in their discretion, which they exercise by general rules, which may be altered at any time so as to exclude all these persons, and thus the prisoner be left to the worst form of solitary confinement.

Even the statutory amelioration is a very limited one. By the words "his attendants" in the statute, is evidently meant the officers of the prison and subordinates, who must necessarily furnish him with his food and his clothing, and make inspection every day that he still exists. They may be forbidden by prison regulations, however, from holding any conversation with him. The attendance of the counsel can only be casual, and a very few interviews, one or two, perhaps, are all that he would have before his death, and that of the physician not at all, unless he was so sick as to require

it, and the spiritual adviser of his own selection, and the members of his family, are all dependent for their opportunities of seeing the prisoner upon the regulations of the prison. The solitary confinement, then, which is meant by the statute, remains of the essential character of that mode of prison life as it originally was prescribed and carried out, to mark them as examples of the just punishment of the worst crimes of the human race.

The brief of counsel for the prisoner furnishes us with the statutory history of solitary confinement in the English law. The act 25 George II, c. 37, entitled "An act for the better preventing the horrid crime of murder," is preceded by the following preamble: "Whereas, the horrid crime of murder has of late been more frequently perpetrated than formerly; and whereas it is thereby become necessary that some further terror and peculiar mark of infamy be added to the punishment of death now by law upon such as shall be guilty of the said offence"— then follow certain enactments, the sixth section of which reads as follows: "*Be it further enacted*, That from and after such conviction and judgment given thereupon, the jailor or keeper to whom such criminal shall be delivered for safe custody shall confine such prisoner to some cell separate and apart from the other prisoners, and that no person or persons whatsoever, except the jailor or keeper, or his servants, shall have access to any such prisoner, without license being first obtained."

This statute is very pertinent to the case before us, as showing, first, what was understood by solitary confinement at that day, and, second, that it was considered as an additional punishment of such a severe kind that it is spoken of in the preamble as "a further terror and peculiar mark of infamy" to be added to the punishment of death. In Great Britain, as in other countries, public sentiment revolted against this severity, and by the statute of 6 and 7 William IV, c. 30, the additional punishment of solitary confinement was repealed.

The term *ex post facto* law, as found in the provision of the Constitution of the United States, to wit, that "no State shall

pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts," has been held to apply to criminal laws alone, and has been often the subject of construction in this court. Without making extracts from these decisions, it may be said that any law which was passed after the commission of the offence for which the party is being tried is an *ex post facto* law, when it inflicts a greater punishment than the law annexed to the crime at the time it was committed, *Calder* v. *Bull*, 3 Dall. 386, 390; *Kring* v. *Missouri*, 107 U. S. 221; *Fletcher* v. *Peck*, 6 Cranch, 87; or which alters the situation of the accused to his disadvantage; and that no one can be criminally punished in this country except according to a law prescribed for his government by the sovereign authority before the imputed offence was committed, or by some law passed afterwards by which the punishment is not increased.

It seems to us that the considerations which we have here suggested show that the solitary confinement to which the prisoner was subjected by the statute of Colorado of 1889, and by the judgment of the court in pursuance of that statute, was an additional punishment of the most important and painful character, and is, therefore, forbidden by this provision of the Constitution of the United States.

Another provision of the statute, which is supposed to be liable to this objection, of its *ex post facto* character, is found in section 3, in which the particular day and hour of the execution of the sentence within the week specified by the warrant shall be fixed by the warden, and he shall invite to be present certain persons named, to wit, a chaplain, a physician, a surgeon, the spiritual adviser of the convict, and six reputable citizens of the State of full age, and that the time fixed by said warden for such execution shall be by him kept secret, and in no manner divulged except privately to said persons invited by him to be present as aforesaid, and such persons shall not divulge such invitation to any person or persons whomsoever, nor in any manner disclose the time of such execution. And section six provides that any person who shall violate or omit to comply with the requirements of section

three of the act shall be punished by fine or imprisonment. We understand the meaning of this section to be that within the one week mentioned in the judgment of the court the warden is charged with the power of fixing the precise day and hour when the prisoner shall be executed ; that he is forbidden to communicate that time to the prisoner; that all persons whom he is directed to invite to be present at the execution are forbidden to communicate that time to him; and that, in fact, the prisoner is to be kept in utter ignorance of the day and hour when his mortal life shall be terminated by hanging, until the moment arrives when this act is to be done.

Objections are made to this provision as being a departure from the law as it stood before, and as being an additional punishment to the prisoner, and therefore *ex post facto*.

It is obvious that it confers upon the warden of the penitentiary a power which had heretofore been solely confided to the court; and is therefore a departure from the law as it stood when the crime was committed.

Nor can we withhold our conviction of the proposition that when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it, which may exist for the period of four weeks, as to the precise time when his execution shall take place. Notwithstanding the argument that under all former systems of adminstering capital punishment the officer appointed to execute it had a right to select the time of *the day* when it should be done, this new power of fixing any day and hour during a period of a week for the execution is a new and important power conferred on that officer, and is a departure from the law as it existed at the time the offence was committed, and with its secrecy must be accompanied by an immense mental anxiety amounting to a great increase of the offender's punishment.

There are other provisions of the statute pointed out in the argument of counsel, which are alleged to be subject to the same objection; but we think the two we have mentioned are

quite sufficient to show that the Constitution of the United States is violated by this statute as applied to crimes committed before it came into force.

These considerations render it our duty to order the release of the prisoner from the custody of the warden of the penitentiary of Colorado, as he is now held by him under the judgment and order of the court.

A question suggests itself, however, to the court which is not a little embarrassing, and which was not presented by counsel in the argument of the case. This consideration arises from the fact that there does not seem to be in the record before us any error in the proceedings of the court on the trial and the verdict of the jury, by which the party was convicted of murder in the first degree. It is only when the sentence or judgment of the court upon that verdict is entered that the error of the proceedings commences. When, in the language of the judgment of the court, the prisoner was ordered to be "kept by the warden of the penitentiary in solitary confinement until the day of his execution," and when the knowledge of the day and the hour of his execution was by the statute to be withheld from him, the Constitution of the United States was violated because the additional punishments were inflicted on him by reason of the direction of the statute, which we have just seen was an *ex post facto* law, and in those respects void as being forbidden by the Constitution of the United States.

If this were a writ of error to the Supreme Court of Colorado, as Kring's case was a writ of error to the Supreme Court of Missouri, our duty would be plain, namely, to reverse the judgment for the error found in it and remand the case to the state court for further proceedings. If such were the case before us our duty would be to reverse the judgment and remand the case to the court below to deal with the prisoner in the face of the fact that a verdict of guilty, which was valid and legal, remains unenforced. But under the writ of *habeas corpus* we cannot do anything else than discharge the prisoner from the wrongful confinement in the penitentiary under the statute of Colorado invalid as to this case.

The language of the act of Congress, however, seems to have contemplated some emergency of the kind now before us. Section 761 of the Revised Statutes declares that the court, or justice, or judge (before whom the prisoner may be brought by writ of *habeas corpus*) shall proceed in a summary way to determine the facts of the case by hearing the testimony and argument, and thereupon to dispose of the party as law and justice require.

What disposition shall we now make of the prisoner, who is entitled to his discharge from the custody of the warden of the penitentiary under the order and judgment of the court, because, within the language of section 753, he is in custody in violation of the Constitution of the United States, but who is, nevertheless, guilty, as the record before us shows, of the crime of murder in the first degree? We do not think that we are authorized to remand the prisoner to the custody of the sheriff of the proper county to be proceeded against, in the court of Colorado which condemned him, in such a manner as they may think proper, because it is apparent that while the statute under which he is now held in custody is an *ex post facto* law in regard to his offence, it repeals the former law, under which he might otherwise have been punished, and we are not advised whether that court possesses any power to deal further with the prisoner or not. Such a question is not before us, because it has not been acted upon by the court below, and it is neither our inclination nor our duty to decide what the court may or what it may not do in regard to the case as it stands. Upon the whole, after due deliberation, we have come to the conclusion that the attorney general of the State of Colorado shall be notified by the warden of the penitentiary of the precise time when he will release the prisoner, from his custody under the present sentence and warrant at least ten days beforehand, and after doing this, and at that time, he shall discharge the prisoner from his custody; and such will be the order of this court.

*On consideration of the application for the discharge of the petitioner, James J. Medley, the writ of habeas corpus, directing J. A. Lamping, warden of the state penitentiary*

*of the State of Colorado at Cañon City, Fremont County, State of Colorado, to produce the body of the said James J. Medley before this court, and to certify the cause of his detention and imprisonment, having been duly issued and served, and the said J. A. Lamping, warden as aforesaid, having certified that said James J. Medley is detained in his custody under and by virtue of a writ issued out of the District Court of Arapahoe County, State of Colorado, and the cause of said imprisonment having been duly inquired into by this court upon the return of the said writ of habeas corpus heretofore issued herein, and counsel having been heretofore heard and due consideration having been had:*

*It is now here ordered by this court that the imprisonment of said James J. Medley, under said writ issued out of the District Court of Arapahoe County, State of Colorado, is without authority of law and in violation of the Constitution of the United States, and that the said James J. Medley is entitled to have his liberty. Whereupon it is hereby ordered that the said James J. Medley be, and he is hereby, discharged from said imprisonment.*

*It is further ordered that the said J. A. Lamping, warden as aforesaid, do notify the Attorney General of the State of Colorado of the day and the hour of the day when he will discharge the said James J. Medley from imprisonment, and that such notice be given at least ten days before the release of the prisoner.*

MR. JUSTICE BREWER (with whom concurred MR. JUSTICE BRADLEY) dissenting.

I dissent from the opinion and judgment as above declared. The substantial punishment imposed by each statute is death by hanging. The differences between the two, as to the manner in which this sentence of death shall be carried into execution, are trifling. What are they? By the old law, execution must be within twenty-five days from the day of sentence. By the new, within twenty-eight days. By the old, confine-

ment prior to execution was in the county jail. By the new, in the penitentiary. By the old, the sheriff was the hangman. By the new, the warden. Under the old, no one had a right of access to the condemned except his counsel, though the sheriff might, in his discretion, permit any one to see him. By the new, his attendants, counsel, physician, spiritual adviser and members of his family have a right of access, and no one else is permitted to see him. Under the old, his confinement might be absolutely solitary, at the discretion of the sheriff, with but a single interruption. Under the new, access is given to him as a matter of right, to all who ought to be permitted to see him. True, access is subject to prison regulations; so, in the jail, the single authorized access of counsel was subject to jail regulations. It is not to be assumed that either regulations would be unreasonable, or operate to prevent access at any proper time. Surely, when all who ought to see the condemned have a right of access, subject to the regulations of the prison, it seems a misnomer to call this "solitary confinement," in the harsh sense in which this phrase is sometimes used. All that is meant is, that a condemned murderer shall not be permitted to hold anything like a public reception; and that a gaping crowd shall be excluded from his presence. Again, by the old law, the sheriff fixes the hour within a prescribed day. By the new, the warden fixes the hour and day within a named week. And these are all the differences which the court can find between the two statutes, worthy of mention.

Was there ever a case in which the maxim, "*De minimis non curat lex*," had more just and wholesome application? Yet, on account of these differences, a convicted murderer is to escape the death he deserves and be turned loose on society.

I am authorized to say that. Mr. Justice Bradley concurs in this dissent.