MANCEL D. ADKINS, *et al.*

*v.*

DONALD E. BORDENKIRCHER,

*Superintendent, West Virginia Penitentiary*

*as successor to*

RICHARD MOHN

(No. 14626)

Decided February 12, 1980.

*Bachmann, Hess, Bachmann & Garden and George E. McLaughlin* for petitioners.

*Chauncey H. Browning*, Attorney General, *Gregory W. Bailey*, Assistant Attorney General, for respondent.

MILLER, JUSTICE:

The petitioners in these original habeas corpus proceedings are 16 inmates of the West Virginia State Penitentiary at Moundsville.[1] They contend that the new "good time" statute, W. Va. Code, 28-5-28 [1977], has been applied to their sentences in *ex post facto* manner, in contravention of Article I, Section 10 of the United States Constitution and Article III, Section 4 of the West Virginia Constitution.[2] We agree and award the writs as moulded.

The petitioners were incarcerated on or after May 1, 1978, the date W. Va. Code, 28-5-28, was first implemented.[3] It is undisputed that petitioners were sentenced—

_____

[1] The petitioners filed separate habeas corpus petitions which involved common issues and which we have consolidated for purposes of hearing and this opinion.

[2] Article I, Section 10 of the Federal Constitition provides in pertinent part: "No State shall ... pass any ... ex post facto law ...."

Article III, Section 4 of the State Constitution states in relevant part: "No ... ex post facto law ... shall be passed."

[3] In *Woodring v. Whyte*, ___ W.Va. ___, 242 S.E.2d 238 (1978), we held that W. Va. Code, 28-5-28, impliedly repealed former W. Va. Code, 28-5-27, the old good time statute, because the new good time law comprehensively altered the standards for awarding good time and the amount of good time that could be earned.

We were also faced in *Woodring* with the fact that the State had failed to implement the new good time statute. We held that the

and thus committed the underlying crimes—before May 1, 1978.

It is also undisputed that under the former good time statute, as applied, a prison inmate could earn more good time credit than under the present good time statute, and therefore was eligible for earlier release than a similarly situated inmate classified under the new system.

We did not engage in any detailed discussion of or comparison between the amount of good time that could be obtained under the old and new statutes in *Woodring v. Whyte,* ____ W.Va. ____, 242 S.E.2d 238 (1978). Following our decision to *Woodring,* the Governor, by Executive Order 8-78, established that the new good time statute should be implemented as of May 1, 1978.[4] Neither party appears to question the Governor's right to establish May 1, 1978, as the effective date for the implementation of the new good time credit statute, W. Va. Code, 28-5-28, and we therefore accept it as the implementation date.

What is challenged is that portion of the Executive Order that sets the inmate's date of entry into the penal system, viz., May 1, 1978, as controlling on whether he is entitled to the benefits of the old or the new good time statute.[5]

---

petitioning inmates "[had] the right to have the State promptly implement the classification and good time credit system, as required by W. Va. Code, 28-5-28 (1977)." [____ W.Va. at ____, 242 S.E.2d at 247].

[4] "It is ORDERED that effective May 1, 1978, the Department of Corrections shall implement the provisions of Code Section 28-5-28 to the fullest extent possible, including the establishment of a classification committee and the determination on a per month basis of the amount of good time to be awarded."

[5] "It is further ORDERED that the Department of Corrections shall provide to each inmate received at any of the three adult correctional institutions prior to May 1, 1978, as much additional good time as would allow the inmate to be released on his expiration date as determined under the former law, provided that subsequent to the date of this Order the inmate does not engage in a major misconduct or within any twelve-month period an accumulation of four or more lesser misconducts, as certified by proper disciplinary procedures."

Simply stated, the petitioners' argument is that with the effective date of implementation of the new good time statute set as of May 1, 1978, then under *ex post facto* law principles the old good time credit statute must be operative as to all persons who committed offenses prior to May 1, 1978. This result must obtain, according to petitioners, because under *ex post facto* principles of the United States and West Virginia Constitutions, a law passed after the commission of an offense which increases the punishment, lengthens the sentence or operates to the detriment of the accused, cannot be applied to him. They cite the following from *Ex parte Medley*, 134 U.S. 160, 171, 33 L. Ed. 835, 840, 10 S.Ct. 384, 387 (1890):

> "[An *ex post facto* law is] any law which was passed after the commission of the offence for which the party is being tried ... when it inflicts a greater punishment than the law annexed to the crime at the time it was committed; [citations omitted] or which alters the situation of the accused to his disadvantage; and ... no one can be criminally punished in this country except according to a law prescribed for his government by the sovereign authority before the imputed offence was committed ...."

*Medley* involved a statute enacted after Medley had committed and was sentenced to death for the underlying offense of murder. He was subjected to the new statute while in prison awaiting execution. Unlike the old statute, this new law mandated solitary confinement for an inmate sentenced to capital punishment. The old law also had vested in the court the power to decide on what date the prisoner would be executed, whereas the new law lodged this power in the warden and ensured that the inmate would not be notified of the warden's decision in advance.

Reasoning that both solitary confinement and the anxiety caused by uncertainty as to the date of execution were harsh measures to which Medley was not subject under the law as it stood at the time he committed the underlying offense, the Court held that the applica-

tion of the new statute to him violated the Ex Post Facto Clause.

Parole eligibility is another facet of penal law scrutinized under the Ex Post Facto Clause. In *Warden v. Marrero*, 417 U.S. 653, 662-63, 41 L. Ed. 2d 383, 392, 94 S.Ct. 2532, 2538 (1974), the Supreme Court strongly implied that a law which altered the conditions of parole eligibility to the detriment of an inmate would contravene the *ex post facto* prohibition:

> "[O]nly an unusual prisoner could be expected to think that he was not suffering a penalty when he was denied eligibility for parole. See *United States v. Ross*, 464 F.2d 376, 379 (CA 2 1972); *United States v. DeSimone*, 468 F.2d 1196, 1199 (CA 2 1972). For the confined prisoner, parole - even with its legal constraints - is a long step toward regaining lost freedom. An observation made in somewhat different context is apt:
>
> > " 'It may be "legislative grace" for Congress to provide for parole but when it expressly removes all hope of parole upon conviction and sentence for certain offences, . . . this is in the nature of an additional penalty.' *Durant v. United States*, 410 F.2d 689, 691 (CA 5 1969).
>
> "[A] repealer of parole eligibility previously available to imprisoned offenders would clearly present the serious question under the *ex post facto* clause . . . of whether it imposed a 'greater or more severe *punishment* than was prescribed by law at the time of the . . . offense,' *Rooney v. North Dakota*, 196 US 319, 325, 49 L Ed 2d 494, 25 S Ct 264 (1905) (emphasis added). See *Love v. Fitzharris*, 460 F2d 382 (CA 9 1972); cf. *Lindsey v. Washington*, 301 US 397, 81 L Ed 1182, 57 S Ct 797 (1937); *Holden v. Minnesota*, 137 US 483, 491-492, 34 L Ed 734, 11 S Ct 143 (1890); *Calder v. Bull*, 3 Dall. 386, 390, 1 L Ed 648 (1798); *United States ex rel. Umbenhowar v. McDonnell*, 11 F. Supp. 1014 (N.D. Ill. 1934)."

Following *Marrero*, the federal courts have rather uniformly held that a superseding law or administrative

rule cannot change the conditions of parole eligibility to the detriment of an imprisoned offender without running afoul of the Ex Post Facto Clause. *Rodriguez v. United States Parole Commission*, 594 F.2d 170 (7th Cir. 1979); *Geraghty v. United States Parole Commission*, 579 F.2d 238, 263-67 (3d Cir. 1978), *cert. granted*, ____ U.S. ____, 59 L. Ed. 2d 632, ____ S.Ct. ____ (1979); *Shepard v. Taylor*, 556 F.2d 648 (2d Cir. 1977). In *Rodriguez*, the court emphasized that it was immaterial that the imprisoned offender might not have received parole at the time of his eligibility. It was, rather, the right of the prisoner to satisfy eligibility conditions, and thus earn the right to demonstrate fitness for parole, which could not be retroactively affected to the inmate's disadvantage. *See Lindsey v. Washington*, 301 U.S. 397, 81 L. Ed. 1182, 57 S.Ct. 797 (1937).

*Rodriguez* invalidated the application to an inmate of a new rule promulgated by the United States Parole Commission which postponed the date by which an inmate would receive a parole hearing. Under the former rule existing at the time he committed the underlying offense, Rodriguez was eligible for a parole hearing after serving one-third of his two-year sentence, or eight months. Under the new rule, he was forced to wait 18 months before a meaningful parole hearing was held. Thus, rather than receive a hearing in the eighth month of confinement, Rodriguez was compelled to wait until the 18th month of his 24-month sentence, and was denied an earlier hearing as prescribed by the former rule, and the court concluded:

> "Eligibility in the abstract is useless; only an unusual prisoner could be expected to think that he is not suffering a penalty when even though he is eligible for parole and might be released if granted a hearing, he is denied that hearing. Denial of any meaningful opportunity for parole by retroactive application of the Parole Commission's rule violates the *ex post facto* clause of the federal Constitution. [Citations omitted]." [594 F.2d at 176].

Good time credit is similar to parole in that each may be earned through the inmate's good behavior in accordance with established standards. As this Court stated with regard to the new West Virginia good time statute, W. Va. Code, 28-5-28, "[the statute] confers a substantive right - the right to receive credit on the prison sentence if the good conduct standards are met." *Woodring v. Whyte,* ___ W.Va. ___, 242 S.E.2d 238, 244 (1978). We observed in *Woodring* that the Supreme Court recognized in *Wolff v. McDonnell,* 418 U.S. 539, 41 L. Ed. 2d 935, 94 S.Ct. 2963 (1964), and *Preiser v. Rodriguez,* 411 U.S. 475, 36 L. Ed. 2d 439, 93 S.Ct. 1827 (1973), that good time is a "valuable right which [cannot] be removed without affording some procedural due process." [___ W.Va. at ___, 242 S.E.2d at 244].

The Supreme Court has not directly considered whether a retroactive change in good time eligibility rules, to the detriment of a prisoner, offends the Ex Post Facto Clause. In *United States v. Addonizio,* ___ U.S. ___, 60 L. Ed. 2d 805, 99 S.Ct. 2235 (1979), the Court held that a change in parole eligibility rules which disappoints the subjective expectations of the sentencing judge does not state a claim for collateral relief under 28 U.S.C. § 2255. The Court expressly left open the question whether such a change might violate the Ex Post Facto Clause. [___ U.S. at ___, 60 L. Ed. 2d at 810, 99 S.Ct. at 2239]. The closest approximation to a decision on the good time issue was the Court's summary affirmance of *Greenfield v. Scafati,* 277 F. Supp. 644 (D. Mass. 1967) (three-judge court), *aff'd,* 390 U.S. 713, 20 L. Ed. 2d 250, 88 S.Ct. 1409 (1968).

*Greenfield* involved a Massachusetts inmate who was paroled after a state law was passed which made a parole violator ineligible to earn good time for the first six months after his return to prison. The law in effect at the time Greenfield committed the underlying offense enabled an inmate to earn good time at any time during his incarceration. When Greenfield violated parole, the new statute was applied to him upon his return to prison.

The court conceded that the application of the new good time parole law "to persons sentenced for a crime committed after its effective date could raise no question," since "[t]he possibility of a partial forfeiture of the right to earn deductions would have been contemplated in the sentence, and would therefore be within the maximum term provided for." [277 F.Supp. at 645]. Such a forfeiture could not have been similarly contemplated, however, by one in Greenfield's situation. The court therefore held:

"[W]e see no distinction between depriving a prisoner of the right to earn good conduct deductions and the right to qualify for, and hence earn, parole. Each, to quote In re Medley, supra, materially 'alters the situation of the accused to his disadvantage.' [Citation omitted.]

"The same must be said as between providing unqualified parole and parole cum onere, i.e., subject to [the new law]. The difference between no penalty, other than a termination of the parole, and a substantial increase in imprisonment for violation, is far from inconsequential. To effect this by legislation enacted after the offense for which sentence was imposed cannot be constitutionally supported." [277 F. Supp. at 646].

In the present case, the potential sentences of some of the petitioners were, in effect, lengthened through the application to them of the less beneficial terms of the new good time statute. This lengthening results from applying the lower deduction rate of the new law to their sentences, thereby delaying their release date.[6] The principles of the foregoing cases are thus directly applicable.

The State's argument that the effective date of the enactment of the new good time credit statute, July 1, 1977, should be the benchmark, cannot be accepted.

[6] This delay factor distinguishes *Milhouse v. Levi*, 179 U.S. App. D.C. 1, 548 F.2d 357 (1976), where the court found that an adverse change in furlough eligibility did not affect the release date, and thus did not violate the Ex Post Facto Clause.

Even if this date were to be selected, *ex post facto* principles would still mandate, as the State concedes, that the old law would be applicable to those inmates who had committed offenses prior to July 1, 1977. Of even more importance is that May 1, 1978, was fixed by the Governor's Executive Order for implementation of the act, and that the implementation of the new act was not accomplished until this date.

We, therefore, conclude that in order to avoid *ex post facto* principles, W. Va. Code, 28-5-28 [1977], must be construed to apply to those persons who committed offenses after May 1, 1978, and those individuals presently incarcerated in State penal institutions for crimes committed prior to May 1, 1978, are entitled to good time credit as calculated under W. Va. Code, 28-5-27 [1931].[7]

In view of the fact that the present record does not fully delineate the date of the commission of the offense upon which each of the petitioners is incarcerated as it relates to May 1, 1978, we are unable to make individual findings. It will be the obligation of the respondent to ascertain the commission date for such offenses, and as to those occurring prior to May 1, 1978, to award good time credit in accordance with the provisions of W. Va. Code, 28-5-27 [1931].

In other words, all inmates who are presently incarcerated on offenses committed prior to May 1, 1978, are entitled to good time credit calculated on the basis of the old good time credit statute.[8]

---

[7] The State recognized in a written memorandum to the superintendents of the various penal institutions dated December 20, 1979, that persons returned on parole violations are entitled to good time credit under the old statute, W. Va. Code, 28-5-27 [1931], if their date of re-entry into the prison system was before May 1, 1978. Today's ruling will require calculation of good time credit under the old statute if the date of the commission of the offense of the returned parolee was before May 1, 1978.

[8] As to those petitioners and others who are incarcerated on or after May 1, 1978, for offenses committed on or after that date, the provisions of the new good time credit statute will apply.

For the reasons herein set out, the writs of habeas corpus as moulded are awarded.

*Writs awarded as moulded.*