# SUPREME COURT OF THE UNITED STATES

RICHARD GERALD JORDAN
17–7153　　　　　　　*v.*
MISSISSIPPI


TIMOTHY NELSON EVANS, AKA TIMOTHY N. EVANS,
AKA TIMOTHY EVANS, AKA TIM EVANS
17–7245　　　　　　　*v.*
MISSISSIPPI

ON PETITIONS FOR WRITS OF CERTIORARI TO THE SUPREME
COURT OF MISSISSIPPI

Nos. 17–7153 and 17–7245.　Decided June 28, 2018

The petitions for writs of certiorari are denied.

JUSTICE BREYER, dissenting from the denial of certiorari.

In my dissenting opinion in *Glossip* v. *Gross,* 576 U. S.
\_\_\_ (2015), I described how the death penalty, as currently
administered, suffers from unconscionably long delays,
arbitrary application, and serious unreliability. *Id.,* at \_\_\_
(slip op., at 2). I write to underline the ways in which the
two cases currently before us illustrate the first two of
these problems and to highlight additional evidence that
has accumulated over the past three years suggesting that
the death penalty today lacks "requisite reliability." *Id.*,
at \_\_\_ (slip op., at 3).

## I

The petitioner in the first case, Richard Gerald Jordan,
was sentenced to death nearly 42 years ago. He argues
that his execution after such a lengthy delay violates the
Eighth Amendment's prohibition on "cruel and unusual
punishments." I continue to believe this question merits
the Court's attention. See *id.*, at \_\_\_–\_\_\_ (slip op., at 17–
33); *Boyer* v. *Davis*, 578 U. S. \_\_\_ (2016) (BREYER, J.,

dissenting from denial of certiorari) (slip op., at 1) ("Richard Boyer was initially sentenced to death 32 years ago"); *Ruiz* v. *Texas*, 580 U. S. ___ (2017) (BREYER, J., dissenting) (slip op., at 1) ("Petitioner Rolando Ruiz has been on death row for 22 years, most of which he has spent in solitary confinement"); *Lackey* v. *Texas*, 514 U. S. 1045, 1046 (1995) (Stevens, J., memorandum respecting denial of certiorari) (discussing petitioner's "17 years under a sentence of death").

More than a century ago, the Court described a prisoner's 4-*week* wait prior to execution as "one of the most horrible feelings to which [a person] can be subjected." *In re Medley*, 134 U. S. 160, 172 (1890). What explains the more than 4-*decade* wait in this case? Between 1976 and 1986, each of Jordan's first three death sentences was vacated on constitutional grounds, including by this Court. See *Jordan* v. *Mississippi*, 476 U. S. 1101 (1986) (vacating death sentence and remanding case in light of *Skipper* v. *South Carolina*, 476 U. S. 1 (1986)); see also Brief in Opposition in No. 17–7153, p. 4–5 ("Jordan was originally convicted and *automatically* sentenced to death" in July 1976—the same month that this Court held mandatory death sentences unconstitutional in *Woodson* v. *North Carolina*, 428 U. S. 280 (1976) (emphasis added)). In 1998, Jordan was sentenced to death for the fourth time. (He had entered into a plea agreement providing for a sentence of life without parole, but the Mississippi Supreme Court invalidated that agreement and the prosecutor refused to reinstate it. See *Jordan* v. *Fisher*, 576 U. S. ___ (2015) (SOTOMAYOR, J., dissenting from denial of certiorari).)

Jordan has lived more than half of his life on death row. He has been under a death sentence "longer than any other Mississippi inmate." 224 So. 3d 1252, 1253 (Miss. 2017). The petition states that since 1977, Jordan has been incarcerated in the Mississippi State Penitentiary

and spent "most of that time on death row living in iso-
lated, squalid conditions." Pet. for Cert. in No. 17–7153,
p. 11; see also *ibid.* (citing *Gates* v. *Cook*, 376 F. 3d 323,
332–335 (CA5 2004) (holding that the conditions of con-
finement on Mississippi State Penitentiary's death row
violate the Eighth Amendment)); Robles, The Marshall
Project, Condemned to Death—and Solitary Confinement
(July 23, 2017), (reporting based upon a nationwide survey
of state corrections officials that Mississippi is 1 among 20
States that permit death row inmates "less than four
hours of out-of-cell recreation time each day"),
https://www.themarshallproject.org/2017/07/23/condemned-
to-death-and-solitary-confinement (all Internet materials
as last visited June 27, 2018); cf. *Davis* v. *Ayala*, 576 U. S.
\_\_\_, \_\_\_ (2015) (KENNEDY, J., concurring) (slip op., at 1)
(noting that "the usual pattern" of solitary confinement
involves "a windowless cell no larger than a typical park-
ing spot" for up to "23 hours a day"). This Court has re-
peated that such conditions bear "'a further terror and
peculiar mark of infamy' [that is] added to the punishment
of death." *In re Medley*, *supra,* at 170. Such "additional
punishment," the Court has said, is "of the most important
and painful character." *Id.*, at 171. In my view, the condi-
tions in which Jordan appears to have been confined over
the past four decades reinforce the Eighth Amendment
concern raised in his petition.

Jordan, now 72 years old, is one among an aging popula-
tion of death row inmates who remain on death row for
ever longer periods of time. Over the past decade, the
percentage of death row prisoners aged 60 or older has
increased more than twofold from around 7% in 2008 to
more than 16% of the death row population by the most
recent estimate. Compare Dept. of Justice, Bureau of
Justice Statistics, T. Snell, Capital Punishment, 2008—
Statistical Tables (rev. Jan. 2010) (Table 7), with Dept. of
Justice, Bureau of Justice Statistics, E. Davis & T. Snell,

Capital Punishment, 2016, p. 7 (Apr. 2018) (Table 4)
(Davis & Snell).  Meanwhile, the average period of impris-
onment between death sentence and execution has risen
from a little over 6 years in 1988 to more than 11 years in
2008 to more than 19 years over the past year.  See Dept.
of Justice, Bureau of Justice Statistics, T. Snell, Capital
Punishment, 2013—Statistical Tables, p. 14 (rev. Dec. 19,
2014) (Table 10); Death Penalty Information Center
(DPIC), Execution List 2018, https://deathpenaltyinfo.org/
execution-list-2018; DPIC, Execution List 2017, https://
deathpenaltyinfo.org/execution-list-2017;     see     also     F.
Baumgartner et al., Deadly Justice: A Statistical Portrait
of the Death Penalty 161, 168, Fig. 8.1 (2018) (analyzing
recent data showing that "nationally, each passing year is
associated with approximately 125 additional days of
delay from crime to execution").

## II

In addition, both Richard Jordan's case and that of
Timothy Nelson Evans, the second petitioner here, illus-
trate the problem of arbitrariness.  To begin with, both
were sentenced to death in the Second Circuit Court Dis-
trict of Mississippi.  Evans says that district accounts for
"the largest number of death sentences" of any of the
State's 22 districts since 1976.  Pet. for Cert. in No. 17–
7245, pp. 5–6; see also App. D to Pet. for Cert. (citing
death sentencing data maintained by Mississippi's Office
of the State Public Defender).

This geographic concentration reflects a nationwide
trend.  Death sentences, while declining in number, have
become increasingly concentrated in an ever-smaller
number of counties.  In the mid-1990's, more than 300
people were sentenced to death in roughly 200 counties
each year.  B. Garett, End of Its Rope: How Killing the
Death Penalty Can Revive Criminal Justice 138–140
(2017).   By comparison, these numbers have declined

dramatically over the past three years. A recent study finds, for example, that in 2015, *all* of those who were sentenced to death nationwide (51 people in total) were sentenced in 38 of this Nation's more than 3,000 counties; in 2016, *all* death sentences (31 in total) were imposed in just 28 counties nationwide (fewer than 1% of counties). *Id.,* at 139–140, Fig. 6.2; see also Garrett, Jakubow, & Desai, The American Death Penalty Decline, 107 J. Crim. L. & C. 561, 564, 584 (2017); Fair Punishment Project, Too Broken To Fix: Part I: An In-Depth Look at America's Outlier Death Penalty Counties 2 (2016) (citing data indicating there were 16 counties, or 0.5% of all counties nationwide, in which five or more death sentences were imposed from 2010 to 2015); cf. M. Radelet, The History of the Death Penalty in Colorado 168 (2017) (explaining that Colorado's three death row inmates "[a]ll were prosecuted in the same judicial district, all the cases came from Aurora, all are young black men, and indeed all attended the same high school"); Joint State Government Commission, Capital Punishment in Pennsylvania: The Report of the Task Force and Advisory Committee 90 (June 2018) ("[D]ifferences among counties in death penalty outcomes . . . were the largest and most prominent differences found in the study. In a very real sense, a given defendant's chance of having the death penalty sought, retracted, or imposed depends upon where that defendant is prosecuted and tried") (internal quotations omitted); *Glossip,* 576 U. S., at \_\_\_ (slip op., at 12) (BREYER, J., dissenting).

This geographic arbitrariness is aggravated by the fact that definitions of death eligibility vary depending on the State. This Court has repeated that "[c]apital punishment must be limited to those offenders who commit a narrow category of the most serious crimes," *Roper* v. *Simmons*, 543 U. S. 551, 568 (2005) (internal quotation marks omitted), since "the culpability of the average murderer is insufficient to justify the most extreme sanction available

to the State." *Atkins* v. *Virginia*, 536 U. S. 304, 319 (2002). But the statutory criteria States enact to distinguish a non-death-eligible murder from a particularly heinous death-eligible murder and thus attempt to use to identify the "worst of the worst" murderers are far from uniform. See Baumgartner, *supra,* at 90–115 (reviewing data collected in a "host" of empirical studies showing "that nearly *all* homicides in a given state are death-eligible").

For instance, as Evans argues, Mississippi is one of a small number of States in which defendants may be (and, in Mississippi's Second Circuit Court District, routinely are) sentenced to death for, among other things, felony robbery murder without any finding or proof of intent to kill. Pet. for Cert. in No. 17–7245, at 4–5, and nn. 3–4; see also *id.,* at 8, n. 10; Miss. Code Ann. §§97–3–19(2)(e), (f), 99–19–101(5)(d) (2017); McCord & Harmon, Lethal Rejection: An Empirical Analysis of the Astonishing Plunge in Death Sentences in the United States From Their Post-*Furman* Peak, 81 Albany L. Rev. 1, 32–33, and n. 155, Table 10 (2018) (citing data indicating the general decline in robbery as an aggravating factor and research arguing that relying upon robbery as a sole aggravator is generally insufficient to identify the "worst of the worst"). And the Court recently considered a petition presenting "unrebutted" evidence that "about 98% of first-degree murder defendants in Arizona were eligible for the death penalty" under Arizona's death penalty statute, which allows for imposition of the death penalty for "felony murder based on 22 possible predicate felony offenses . . . including, for example, transporting marijuana for sale." *Hidalgo* v. *Arizona*, 583 U. S. ___, ___, ___ (2018) (BREYER, J., statement respecting denial of certiorari) (slip op., at 4, 7).

I recognize that only a small fraction of the roughly 8,000 death sentences imposed since 1976 have resulted in executions. Executions continue to decline from the mod-

ern peak of 98 executions occurring across 72 counties and 20 States in 1999 to 28 executions in 22 counties across 6 States in 2015. Baumgartner, *supra,* at 328. In 2016, 20 people were executed. That number remains the fewest executions in more than a century, just below the 23 executions that took place in 2017. See Davis & Snell 8, 15. More than 700 people await execution on California's death row but the State, which has executed 13 people since 1976, has not carried out an execution since 2006. *Id.,* at 3; DPIC, State by State Database: California, https://deathpenaltyinfo.org/state_by_state. The State of Mississippi, which has executed a total of 21 people since 1976, has not carried out an execution in more than six years. DPIC, State by State Database: Mississippi, https://deathpenaltyinfo.org/state_by_state. This data suggests that the death penalty may eventually disappear. But it also shows that capital punishment is "unusual" (as well as "cruel").

## III

Finally, I note that in the past three years, further evidence has accumulated suggesting that the death penalty as it is applied today lacks "requisite reliability." *Glossip,* 576 U. S*.,* at ___ (BREYER, J., dissenting) (slip op., at 3). Four hours before Willie Manning was slated to die by lethal injection, the Mississippi Supreme Court stayed his execution and on April 21, 2015, he became the fourth person on Mississippi's death row to be exonerated. *Id.,* at ___ (slip op., at 21); National Registry of Exonerations (June 25, 2018), https://www.law.umich.edu/special/ exoneration/Pages/detaillist.aspx. Since January 2017, six death row inmates have been exonerated. See DPIC, Description of Innocence, https://deathpenaltyinfo.org/ innocence-cases#157. Among them are Rodricus Crawford, Rickey Dale Newman, Gabriel Solache, and Vicente Benavides Figueroa, whose exonerations were based upon

evidence of actual innocence. See National Registry of
Exonerations (June 25, 2018), https://www.law.umich.edu/
special/exoneration/Pages/detaillist.aspx.

*      *      *

In my view, many of the capital cases that come before
this Court, often in the form of petitions for certiorari,
involve, like the cases of Richard Jordan and Timothy
Evans, special problems of cruelty or arbitrariness.
Hence, I remain of the view that the Court should grant
the petitions now before us to consider whether the death
penalty as currently administered violates the Constitu-
tion's Eighth Amendment.