**Robin Parsons ORANGE and Laura Campbell, Plaintiffs,**

v.

**COUNTY OF GRUNDY, Grundy County Board of Education, Robert K. Fults, in his official capacity as Superintendent and in his individual capacity, Pamela Pickett, in her official capacity as Assistant Principal and in her individual capacity, Defendants.**

No. 4:94–cv–78.

United States District Court, E.D. Tennessee.

April 12, 1996.

Michelle M. Benjamin, Winchester, TN, for Plaintiffs.

Richard R. Ruth, Jr., Lex A. Coleman, Ruth, McCarthy & Coleman, Chattanooga, TN, for Defendants.

## MEMORANDUM OPINION

JARVIS, Chief Judge.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. It is brought by two former students at Grundy County High School claiming that their procedural and substantive due process rights were violated when they were held in "isolation" in small supply rooms as punishment for leaving school without permission. All defendants have moved for summary judgment contending that plaintiffs failed to state a claim upon which relief can be granted. The individual defendants, Ronald K. Fults and Pamela Pickett, also moved for summary judgment on the grounds of qualified immunity [Court File # 39]. For the reasons that follow, the motion for summary judgment will be denied.

### I.

#### Grundy County's "In-School Suspension" Program

Grundy County High School is a public secondary school located in Tracy City, Tennessee. It operates under the direction of the Grundy County Board of Education. Defendant Ronald K. Fults is the Superintendent of Schools for Grundy County, while defendant Pamela Pickett has been employed as either a teacher or assistant principal at Grundy County High School. Prior to the 1993–94 school year, the principals and assistant principals employed by Grundy County disciplined students by the use of both in-school and out-of-school suspension. Out-of-school suspension consisted of the student not being allowed on school premises for a predetermined period of time. Under this form of discipline, the school days missed applied against the student's minimum attendance and academic requirements. In-school suspension, on the other hand, required the offending student to be partially segregated from other students, but allowed to obtain and work on class assignments for a

predetermined period of time. This form of discipline was administered on school grounds and monitored by faculty members, incident to which the students were still able to receive attendance and academic credit for the classes missed. The students were not isolated from other students during in-school suspension.

For part of the 1993–94 school year, Grundy County administered a form of discipline known as "alternative school." With "alternative school," the students were required to go to the field house and complete their school work at desks placed throughout the building for that purpose. It does not appear that there was much if any difference between "alternative school" and "in-school suspension." Prior to the 1993–94 school year, the Grundy County High School field house was used as the alternative school not just for Grundy County High School, but for all public schools supervised by the Board of Education in Grundy County. The Grundy County Board of Education has posted and maintained a full-time position for an alternative school teacher.

The defendants claim that during the spring semester of 1992–93, Superintendent Fults was approached by Board of Education member James Griswald about the use of out-of-school suspension for students caught skipping school. Mr. Griswald was critical of students being disciplined for skipping class by being made to miss more classes. Mr. Griswald's complaints were raised at the Board of Education's May 20, 1993, meeting, and a work group including Mr. Fults was appointed to find a way to reduce out-of-school suspensions.

During the late summer of 1993, Grundy County's baseball coach and athletic director, Ted Ladd, was appointed as Grundy County High School principal. At Ladd's request, Jody Hargis was appointed assistant principal. Mr. Griswald made his case for adoption of a new policy on student discipline to Mr. Ladd, who along with Mr. Hargis implemented "student isolation" as an alternative form of in-school suspension. Defendants contend that this was in part necessitated by the absence of an alternative school for the fall semester, due to the previous year's alternative school teacher having left the system.

At the beginning of the 1993–94 school year, Principal Ladd called a student assembly. As part of his address to the student body, Principal Ladd told the students that in-school suspension by means of isolation would be used as a form of student discipline.

As initially implemented under Principal Ladd, isolation as a form of punishment consisted of placing the offending student at a desk in the text book storage room adjacent to Mr. Hargis' office. Use of that room began to interfere with the performance of Mr. Hargis' duties as assistant principal, and it later resulted in text book storage rooms off of Coach Ray's classroom and the library being used. Students in isolation were to bring their lunch to school. Defendants contend that students in isolation were allowed to go to the bathroom after obtaining permission from the monitoring faculty member, although when in isolation they were not allowed to go to the bathroom between classes or when other students were out in the halls. Only the principal and assistant principal were allowed to administer suspension. Coach Ray, the librarian, and, when necessary, other teachers were instructed to monitor students assigned to in-school suspension. The text book storage rooms off of Coach Ray's classroom measured eight-by-five feet and twelve-by-five feet, respectively. Each storage room was equipped with a student desk and fluorescent lighting. When in isolation, the offending students were not required to close the doors to the respective text book storage rooms.

During its September 7, 1993 meeting of the Board of Education, the Board rescinded its vote hiring Mr. Ladd as Grundy County High School principal. This resulted in Darryl Brown being asked to fill two positions, a new administrative position with the Board of Education and his old position as principal of Grundy County High School, until a permanent replacement could be found for Mr. Ladd. When Mr. Brown was reappointed as principal, Pamela Pickett was unofficially reappointed as assistant principal, a position she shared with Mr. Hargis for the remainder of the 1993–94 school year.

## II.

### The Claim of Robin Parsons Orange [1]

Plaintiff Robin Orange has suffered with a bladder disorder since she was in elementary school. During the eight years of elementary school, she was allowed by Principal Ronnie Fults to use a private restroom where she could catheterize herself to avoid risking embarrassment and ridicule by other students. Fults later became Superintendent of the school system.

When plaintiff began high school in 1989, her mother discussed her bladder condition with the assistant principal, Ms. Pickett, and provided her with a doctor's statement regarding plaintiff's medical condition. Plaintiff's mother requested the same accommodation for privacy that had been made at the elementary school, but this was denied. However, Ms. Pickett did accommodate plaintiff's parents' request that plaintiff be excused from class to go to the restroom as necessary. Defendants contend that Ms. Pickett advised the teachers of plaintiff's urological condition and she was allowed to leave class as necessary. During the 1992–93 school year, plaintiff, because of her medical needs, was permitted to sign herself out to go home to change clothes and catheterize herself when necessary.

Plaintiff returned to Grundy County High School during the 1993–94 academic year to enroll in a few courses to complete her senior year. In early November, 1993, she requested to sign herself out because she had involuntarily wet her clothes. Plaintiff claims that her request to leave school was refused by the office staff, even though they were reminded that her parents had given her permission to leave school when needed. Plaintiff contends that she was then faced with an emergency situation and she decided to leave school to change into clean, dry clothes.

On November 15, 1993, Ms. Pickett instructed plaintiff to come to the office and instructed her that she would be placed in detention for leaving school without permission. When asked whether she agreed that she left school without permission of school personnel, plaintiff responded in the affirmative and claims that she was asked no further questions. Plaintiff's claim that no attempt was made by Ms. Pickett or other school personnel to advise plaintiff's parents that the in-school isolation was about to take place.

As punishment for leaving school without permission, Ms. Pickett instructed the plaintiff to report to Coach Ray's classroom. Plaintiff contends that the coach instructed her to go into a small, dirty, cluttered closet located in his classroom which contained a desk, a light bulb hanging from the ceiling, a mop and a bucket, dust, dirt, and discarded food on the floor. Plaintiff claims that during her first day of isolation in the storage closet her request to be allowed to use the restroom was refused by the coach. She claims that she was told she could not use the restroom and to go back in the closet and not come out. She contends that she was told to stay in there all day, where she sat shivering in wet clothes.

Plaintiff Orange claims that she had no prior notice that she would be confined to the storage closet for the entire school day and thus did not bring any lunch with her. She claims that the school made no arrangements for her to use the restroom or to be provided lunch. She further claims that during the first day of isolation in the storage closet not one teacher or school official supervised or checked on her. Plaintiff alleges that she was afraid to come out after Coach Ray would not allow her to go to the restroom and told her to stay in the closet.

Plaintiff contends that her urological condition caused her clothes to become wet, and she sat shivering in the storage closet for two

1. Defendants contend that plaintiff Orange has submitted an affidavit which contradicts her earlier deposition testimony and that a party may not create a factual issue by filing an affidavit which contradicts her earlier deposition testimony. *See Gagne v. Northwestern Nat. Ins. Co.*, 881 F.2d 309 (6th Cir.1989). The court has reviewed the affidavit and deposition and finds no clear contradictions. There is testimony from which a contradiction might be inferred, but there might also be a reasonable explanation for the seeming contradiction. Accordingly, it would be inappropriate to disregard Ms. Orange's affidavit.

days. On the second day, plaintiff contends that the coach would allow her to use the restroom only when students were in classes and the halls were empty. She claims that she requested to be allowed to use the restroom while there were no students present in the coach's classroom to avoid embarrassment upon exiting the storage closet, but apparently that request was denied. At some point during the second day, defendant Fults did check on her and she seemed to be "O.K."

Ms. Orange claims that she became distressed about returning to school and being ridiculed by other students. She says that, when she returned to school and was subjected to ridicule, she eventually left Grundy County to complete her high school education in an adjacent county.

Plaintiff's mother alleges that upon discovering that her daughter had been placed in isolation in a cold storage closet, she spoke with defendant Pickett on the following Monday afternoon. She told Ms. Pickett that she had signed a permission form which had been previously honored which allowed plaintiff to sign herself out of school. She claims that Ms. Pickett implied that the form was for last year and insisted that the plaintiff complete isolation in the storage closet as punishment, despite the emergency which had necessitated her leaving school.

### III.

*The Claim of Plaintiff Laura Campbell*

Plaintiff Laura Campbell claims that she was a good student and that before the incident which is the subject of this lawsuit had not been disciplined by school officials. She claims that on the morning of November 1, 1993, Ms. Pickett punished her by isolation in a storage closet because she had signed herself out of school believing she had a dental appointment. Plaintiff claims that when she reported for school on November 1 she had no idea she would be punished by isolation in a storage closet. Ms. Campbell alleges that upon a phone call to her mother she was advised by Ms. Pickett that she was wasting her time because her mind was already made up to give her isolation suspension. Plaintiff

claims that when her mother spoke to Ms. Pickett on the telephone, Ms. Pickett was unwilling to discuss the matter further. When plaintiff's mother came to the school, Ms. Pickett again told her there was nothing to discuss. Plaintiff claims that Ms. Pickett advised her mother that plaintiff would be put in a room near the principal's office and refused to let the plaintiff leave with her mother.

On the second day of isolation suspension, plaintiff claims that she was placed in a cold corner near a window in the library. She claims that the corner of the library was so cold that her hands and feet turned blue. She was later moved from the library and sent to another storage closet which was very cold and dirty, filled with old books, boxes, dust, discarded food and other trash. She claims that the door was shut and there was no heat. Plaintiff alleges that she was very cold and simply sat at the desk and tried to keep warm. She also claims she was given very little work or assignments to complete because the classes were going to be mostly classroom instruction and not written work.

Plaintiff Campbell claims that on both days the teacher in the room told her to go inside and not come out of the storage closet. She further claims that no arrangements were made by school officials or teachers for her to use the restroom or have lunch. She claims that she was unsupervised and no school official or teacher checked on her either day she spent in isolation. Plaintiff claims that she was shocked and afraid to come out of the closet because she feared what might happen if she failed to do just as she was told.

### IV.

*Summary Judgment Standard*

Pursuant to Rule 56, summary judgment shall be rendered when requested if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. It is the burden of the party seeking summary judgment to show the

court that, under uncontradicted facts, the moving party is entitled to judgment as a matter of law. Summary judgment is intended to provide a quick, inexpensive means of resolving issues as to which there is no dispute regarding the material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing the validity of a summary judgment motion, the court views the pleadings, depositions, answers to interrogatories, admissions, and competent affidavits in a light most favorable to the opponent of the motion. However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

## V.

### *Qualified Immunity*

Plaintiffs contend that defendants violated their procedural and substantive due process rights by placing them in isolation as a form of punishment. The individual defendants contend that they are entitled to qualified immunity with respect to both of these constitutional claims.

Qualified immunity is available to government officials performing discretionary functions. *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736–37, 73 L.Ed.2d 396 (1982). Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action ... assessed in light of the legal rules that were "clearly established" at the time it was taken.

*Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). "A necessary concomitant to the determination of whether the constitutional right asserted by plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The Court has described what is meant by "clearly established" as follows:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful, ... but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity. *Wegener v. Covington,* 933 F.2d 390, 392 (6th Cir. 1991). Defendants bear the initial burden of coming forward with facts to suggest that they are acting within the scope of their discretionary authority during the incident in question. *Id.* Thereafter, the burden shifts to the plaintiff to establish that the defendants' conduct violated a right so clearly established that any official in defendants' positions would have clearly understood that they were under an affirmative duty to refrain from such conduct.

In order to be clearly established, the question must be decided by the United States Supreme Court, by the United States Court of Appeals for the circuit in which the court sits, previous decisions by the district court itself, or by the highest state court in the state where the case arose. *Eugene Dee v. Karman,* 889 F.2d 701, 706 n. 6 (6th Cir.1989).

## VI.

### *The Law as it Existed Regarding Procedural and Substantive Due Process at the Time of Plaintiffs' Punishment*

The defendants contend that the plaintiffs have failed to state either a substantive or

procedural due process claim. Further, they contend that, even if such a claim was stated, defendants Fults and Pickett are entitled to qualified immunity since, at the time of their actions, a reasonable person in their positions would not have known that their conduct violated any of plaintiffs' clearly established constitutional rights.

In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the United States Supreme Court held that a student faced with a temporary suspension from school has a property interest in the educational benefits temporarily denied and a liberty interest in reputation that qualify for protection under the Due Process Clause. *Id.* The Court held that a student faced with a suspension of 10 days or less must be given at least minimal due process. Specifically, "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581, 95 S.Ct. at 740. The defendants do not deny that plaintiffs had these due process rights which had to be met before their in-school suspensions could be carried out. However, defendants claim that, in this case, both plaintiffs were notified of the charges against them and offered the opportunity to explain their misconduct.

 Plaintiffs deny that they were offered this opportunity. Ms. Orange states in her affidavit the following:

. . . . .

6. No one spoke to me about leaving school early or told me I was going to be punished, until the morning of Friday, November 15, 1993, nearly two weeks later. When I reported to school, Ms. Pickett told me to come to the office. I went to a room where Ms. Pickett and the principal were present. Ms. Pickett told me I would be placed in detention for leaving school without permission. She nor anyone else asked me why I needed to leave school.

7. I had not been previously informed nor did I have any reason to believe I would be punished for leaving school under such an emergency condition.

. . . . .

14. Neither Ms. Pickett nor the principal told me that I was going to be placed in isolation for leaving school without permission. I did not agree to being punished by being isolated in a dirty cold dimly-lit storage closet. In fact, I was not asked if I agreed or disagreed. Ms. Pickett did not consider my mother's explanation and objection to being punished a second day by isolation in the storage closets.

Affidavit of Robin Parsons Orange. A question of material fact has been raised regarding whether Ms. Orange was provided the minimal due process rights which should have taken place prior to her punishment. The law which created those rights was clearly established in *Goss*, and a reasonable official in the defendants' position would have been aware of those rights.

The same can be said for the claim of Ms. Campbell. Ms. Campbell states the following in her affidavit:

2. When I reported to school on November 1, 1993, I had no idea that I would be punished in such a manner. My request to call my mother was at first refused by Ms. Pickett, who told me I was wasting my time calling my mother because her mind was already made up. My mother spoke to Ms. Pickett on the telephone who was unwilling to discuss the matter any further. She told me her mind was already made up to suspend me. She told my mother that there was no need for her to come to school to talk about it. Because I was tearful and afraid of what was going to happen, my mother came to school. Ms. Pickett told my mother that her mind was made up and there was nothing to discuss ...

Affidavit of Laura Campbell. If Ms. Campbell's allegations are true, then it is clear that she was not offered the opportunity to explain her side of the story.

In light of the foregoing, the two individual defendants are not entitled to summary judgment on the basis of qualified immunity with

regard to plaintiffs' procedural due process claims.

With respect to plaintiffs' substantive due process claims, plaintiffs allege that they were isolated, at least for one full school day each, in a text book storage closet off of the coach's room. Both claim that they were denied restroom access during this period and no provision was made for their lunch. Defendants dispute these claims, contending that plaintiffs did have the opportunity to use the restroom, they just were not allowed to go while other students were in the halls. Defendants also contend that they could have had lunch if they had brought their lunch with them. The court is of the opinion that material factual disputes exist with respect to whether the plaintiffs were provided the opportunity to use the restroom or should have known that the opportunity existed and whether they should have known that they were required to bring their lunches on the days of their isolation. One problem that is troubling is that, from the evidence presented, it appears there was little supervision of the plaintiffs while they were in isolation. There is no evidence that anyone ever checked on them to see if they needed to use the restroom or to see if they had their lunches other than the one time that defendant Fults checked on Ms. Orange. From the evidence, a good argument can be made that they were simply placed in the storage room and forgotten for the day.

There are no cases from the United States Supreme Court, the United States Court of Appeals for the Sixth Circuit, the Tennessee Supreme Court, or any court in this district dealing with the punitive isolation of public school students. However, isolation as a form of punishment has been used in this country's prisons for centuries and the potential for serious harm to inmates confined in isolation has long been realized. Over a century ago, the United States Supreme Court noted the country's experiences with penitentiaries where convicts were kept in isolation and its effects were described as follows:

> A considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*In re Medley,* 134 U.S. 160, 168, 10 S.Ct. 384, 386, 33 L.Ed. 835 (1890). Even when isolation is an appropriate form of punishment of convicted criminals, it violates the Eighth Amendment to deny them basic necessities of life, such as food or access to toilet facilities. The court is of the opinion that placing school children in isolation for an entire school day without access to lunch or a toilet facility "shocks the conscience". *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952). In the few cases where isolation of school children has been utilized either as a form of punishment or a form of "teaching", the courts have found the practice to be unconstitutional. *See Jefferson v. Ysleta Independent School District,* 817 F.2d 303 (5th Cir.1987). The court is of the opinion that a reasonable teacher in the individual defendants' position would have known that the day-long isolation of students without access to lunch or toilet facilities was unconstitutional. Accordingly, the individual defendants' motion for summary judgment on the issue of qualified immunity will be denied.

I am aware that defendants contend that these necessities could have been provided for if the plaintiffs had simply asked. However, it is also apparent that the individual defendants were responsible for the well-being of these children and plaintiffs claim that little effort was made to supervise or check on them while they were in this punitive isolation.

## VII.

### *Respondeat Superior*

The doctrine of *respondeat superior* does not apply in § 1983 actions for damages. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To prevail on their claims against the county, the plaintiffs must

prove that the Grundy County Board of Education, through its policies and customs, was the "moving force" behind the alleged constitutional violations. *Ritchie v. Wickstrom,* 938 F.2d 689 (6th Cir.1991). In this case, the use of isolation as a form of punishment was the direct result of a policy established by the Grundy County Board of Education. It also appears that when the Board of Education created that policy it did not provide any safeguards to be utilized when isolation was carried out nor any procedures to be used prior to imposition of such a punishment. The Board of Education therefore created the system which allowed the alleged abuses to occur in this case. The court is of the opinion the Grundy County Board of Education is not entitled to summary judgment.

## VIII.

### *The Board of Education's Eleventh Amendment Immunity*

Defendants contend that local boards of education are integral parts of the state's education system and are therefore entitled to its Eleventh Amendment immunity.

A suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Only where Congress has explicitly abrogated a state's immunity to suit on the face of a statute, *see Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985), or where the state itself has consented to suit, *see Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974), will a federal court have jurisdiction over a state defendant. Congress did not abrogate state sovereign immunity to suit under 42 U.S.C. § 1983. *See Quern,* 440 U.S. at 341, 99 S.Ct. at 1145.

Although the protection of the Eleventh Amendment "does not extend to counties and similar municipal corporations," *Mt. Healthy School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 573,

50 L.Ed.2d 471 (1977), the court has observed that "some agencies exercising state power have been permitted to invoke the [Eleventh] Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself." *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 400–01, 99 S.Ct. 1171, 1176–77, 59 L.Ed.2d 401 (1979). The issue presented here is whether a judgment against the Grundy County Board of Education would have "essentially the same practical consequences as a judgment against the State itself."

County school boards in the State of Tennessee are both creatures of the state and the county they serve. Whether a judgment against the Grundy County Board of Education would come out of state coffers such that the Board of Education would be entitled to Eleventh Amendment immunity from claims for money damages against it is not clear at this point. The United States Court of Appeals for the Sixth Circuit has at least twice pretermitted the issue of whether a local board of education is an arm of the state such that it is entitled to Eleventh Amendment immunity. *See Adkins v. Magoffin County Board of Education,* 982 F.2d 952 (6th Cir.1993); *Williams by Williams v. Ellington,* 936 F.2d 881 (6th Cir.1991). Without further information on where funds to pay a judgment against the Grundy County Board of Education would come, it is impossible at this time to determine whether it is entitled to Eleventh Amendment immunity for claims against it for money damages. The defendants contend that the state would be liable for such a money damage claim and cite T.C.A. §§ 49–2–101 and 49–3–301. However, a reading of those two statutes does not compel that result. Rather, T.C.A. § 49–2–101 requires the county to raise some of the funds for the local school and T.C.A. § 49–3–301 requires that the state provide some of the funds. At this point, the court cannot conclude that the Grundy County Board of Education is entitled to Eleventh Amendment immunity. Moreover, even if it had Eleventh Amendment immunity from a claim for money damages, the Board of Education

could still be required to comply with prospective injunctive relief and possibly be liable for accompanying attorneys fees. In light of the foregoing, the Grundy County Board of Education's motion for summary judgment will be denied.

## IX.

### Conclusion

Accordingly, defendants' motion for summary judgment [Court File # 39] and supplemental motion for summary judgment [Court File # 45] will be denied. All motions filed prior to the filing of defendants' motion for summary judgment on the qualified immunity question [Court File # 39] will be denied as moot. If matters underlying those motions remain in dispute, defendants may renew those motions at this time, or if they choose to immediately appeal this court's ruling on the qualified immunity question, then they may renew those motions upon resolution of that appeal.

Order accordingly.

### ORDER

For the reasons set forth in the Memorandum Opinion this day passed to the Clerk for filing, it is hereby ORDERED that defendants' motion for summary judgment [Court File # 39] and supplemental motion for summary judgment [Court File # 45] are DENIED. All motions filed prior to the filing of defendants' motion for summary judgment on the qualified immunity question [Court File # 39] are DENIED AS MOOT. If matters underlying those motions remain in dispute, defendants may renew those motions at this time, or if they choose to immediately appeal this court's ruling on the qualified immunity question, then they may renew those motions upon resolution of that appeal.

